[No. S029132. Sept. 2, 1994.]

NATORE A. NAHRSTEDT, Plaintiff and Appellant, v.
LAKESIDE VILLAGE CONDOMINIUM ASSOCIATION, INC., et al.,
Defendants and Respondents.

362

## Counsel

Joel F. Tamraz for Plaintiff and Appellant.

Wilner, Klein & Siegel, Leonard Siegel, Laura J. Snoke and Thomas M. Ware II for Defendants and Respondents.

Gerald J. Van Gemert, James A. Judge, Bigelow, Moore & Tyre, James S. Tyre, Musick, Peeler & Garrett, Gary L. Wollberg, Berding & Weil, James O. Devereaux, Bergerson & Garvic and John Garvic as Amici Curiae on behalf of Defendants and Respondents.

Swanson & Dowdall and C. Brent Swanson as Amici Curiae.

## Opinion

**KENNARD, J.**—A homeowner in a 530-unit condominium complex sued to prevent the homeowners association from enforcing a restriction against keeping cats, dogs, and other animals in the condominium development. The owner asserted that the restriction, which was contained in the project's declaration[1] recorded by the condominium project's developer, was "unreasonable" as applied to her because she kept her three cats indoors and because her cats were "noiseless" and "created no nuisance." Agreeing with the premise underlying the owner's complaint, the Court of Appeal concluded that the homeowners association could enforce the restriction only

---

[1] The declaration is the operative document for a common interest development, setting forth, among other things, the restrictions on the use or enjoyment of any portion of the development. (Civ. Code, §§ 1351, 1353.) In some states, the declaration is also referred to as the "master deed." (See *Dulaney Towers Maintenance* v. *O'Brey* (1980) 46 Md.App. 464 [418 A.2d 1233, 1235].)

upon proof that plaintiff's cats would be likely to interfere with the right of other homeowners "to the peaceful and quiet enjoyment of their property."

Those of us who have cats or dogs can attest to their wonderful companionship and affection. Not surprisingly, studies have confirmed this effect. (See, e.g., Waltham Symposium 20, Pets, Benefits and Practice (BVA Publications 1990); Melson, *The Benefits of Animals to Our Lives* (Fall 1990) People, Animals, Environment, at pp. 15-17.) But the issue before us is not whether in the abstract pets can have a beneficial effect on humans. Rather, the narrow issue here is whether a pet restriction that is contained in the recorded declaration of a condominium complex is enforceable against the challenge of a homeowner. As we shall explain, the Legislature, in Civil Code section 1354, has required that courts enforce the covenants, conditions and restrictions contained in the recorded declaration of a common interest development "unless unreasonable."[2]

Because a stable and predictable living environment is crucial to the success of condominiums and other common interest residential developments, and because recorded use restrictions are a primary means of ensuring this stability and predictability, the Legislature in section 1354 has afforded such restrictions a presumption of validity and has required of challengers that they demonstrate the restriction's "unreasonableness" by the deferential standard applicable to equitable servitudes. Under this standard established by the Legislature, enforcement of a restriction does not depend upon the conduct of a particular condominium owner. Rather, the restriction must be uniformly enforced in the condominium development to which it was intended to apply unless the plaintiff owner can show that the burdens it imposes on affected properties so substantially outweigh the benefits of the restriction that it should not be enforced against any owner. Here, the Court of Appeal did not apply this standard in deciding that plaintiff had stated a claim for declaratory relief. Accordingly, we reverse the judgment of the Court of Appeal and remand for further proceedings consistent with the views expressed in this opinion.

I

Lakeside Village is a large condominium development in Culver City, Los Angeles County. It consists of 530 units spread throughout 12 separate 3-story buildings. The residents share common lobbies and hallways, in addition to laundry and trash facilities.

---

[2]Under Civil Code section 1354, subdivision (a) such use restrictions are "enforceable equitable servitudes, unless unreasonable." Further undesignated references are to the Civil Code.

The Lakeside Village project is subject to certain covenants, conditions and restrictions (hereafter CC&R's) that were included in the developer's declaration recorded with the Los Angeles County Recorder on April 17, 1978, at the inception of the development project. Ownership of a unit includes membership in the project's homeowners association, the Lakeside Village Condominium Association (hereafter Association), the body that enforces the project's CC&R's, including the pet restriction, which provides in relevant part: "No animals (which shall mean dogs and cats), livestock, reptiles or poultry shall be kept in any unit."[3]

In January 1988, plaintiff Natore Nahrstedt purchased a Lakeside Village condominium and moved in with her three cats. When the Association learned of the cats' presence, it demanded their removal and assessed fines against Nahrstedt for each successive month that she remained in violation of the condominium project's pet restriction.

Nahrstedt then brought this lawsuit against the Association, its officers, and two of its employees,[4] asking the trial court to invalidate the assessments, to enjoin future assessments, to award damages for violation of her privacy when the Association "peered" into her condominium unit, to award damages for infliction of emotional distress, and to declare the pet restriction "unreasonable" as applied to indoor cats (such as hers) that are not allowed free run of the project's common areas. Nahrstedt also alleged she did not know of the pet restriction when she bought her condominium. The complaint incorporated by reference the grant deed, the declaration of CC&R's, and the condominium plan for the Lakeside Village condominium project.

The Association demurred to the complaint. In its supporting points and authorities, the Association argued that the pet restriction furthers the collective "health, happiness and peace of mind" of persons living in close proximity within the Lakeside Village condominium development, and therefore is reasonable as a matter of law. The trial court sustained the demurrer as to each cause of action and dismissed Nahrstedt's complaint. Nahrstedt appealed.

A divided Court of Appeal reversed the trial court's judgment of dismissal. In the majority's view, the complaint stated a claim for declaratory relief based on its allegations that Nahrstedt's three cats are kept inside her condominium unit and do not bother her neighbors. According to the majority, whether a condominium use restriction is "unreasonable," as that term is used in section 1354, hinges on the facts of a particular homeowner's case.

---

[3]The CC&R's permit residents to keep "domestic fish and birds."
[4]Further references to the Association will pertain to these defendants collectively.

Thus, the majority reasoned, Nahrstedt would be entitled to declaratory relief if application of the pet restriction in her case would not be reasonable. The Court of Appeal also revived Nahrstedt's causes of action for invasion of privacy, invalidation of the assessments, and injunctive relief, as well as her action for emotional distress based on a theory of negligence.

The dissenting justice took the view that enforcement of the Lakeside Village pet restriction against Nahrstedt should not depend on the "reasonableness" of the restriction as applied to Nahrstedt. To evaluate on a case-by-case basis the reasonableness of a recorded use restriction included in the declaration of a condominium project, the dissent said, would be at odds with the Legislature's intent that such restrictions be regarded as presumptively reasonable and subject to enforcement under the rules governing equitable servitudes. Application of those rules, the dissenting justice concluded, would render a recorded use restriction valid unless "there are constitutional principles at stake, enforcement is arbitrary, or the association fails to follow its own procedures."

On the Association's petition, we granted review to decide when a condominium owner can prevent enforcement of a use restriction that the project's developer has included in the recorded declaration of CC&R's.

To facilitate the reader's understanding of the function served by use restrictions in condominium developments and related real property ownership arrangements, we begin with a broad overview of the general principles governing common interest forms of real property ownership.

## II

Today, condominiums, cooperatives, and planned-unit developments with homeowners associations have become a widely accepted form of real property ownership. These ownership arrangements are known as "common interest" developments. (4B Powell, Real Property (1993) Condominiums, Cooperatives and Homeowners Association Developments, § 631, pp. 54-7 to 54-8; 15A Am.Jur.2d, Condominium and Co-operative Apartments, § 1, p. 827.) The owner not only enjoys many of the traditional advantages associated with individual ownership of real property, but also acquires an interest in common with others in the amenities and facilities included in the project. It is this hybrid nature of property rights that largely accounts for the popularity of these new and innovative forms of ownership in the 20th century. (4B Powell, Real Property, *supra*, § 631, pp. 54-7 to 54-8.)

The term "condominium," which is used to describe a system of ownership as well as an individually owned unit in a multi-unit development, is

Latin in origin and means joint dominion or co-ownership. (4B Powell, Real Property, *supra*, § 632.1[4], p. 54-18.) The concept of shared real property ownership is said to have its roots in ancient Rome. (*Ibid.*; see also Ramsey, *Condominium* (1963) 9 Prac. Law. 21; Note, *Land Without Earth—The Condominium* (1962) 15 U.Fla. L.Rev. 203, 205.) The accuracy of this view has been challenged, however. (See Natelson, *Comments on the Historiography of Condominium: The Myth of Roman Origin* (1987) 12 Okla. City U. L.Rev. 17; 15A Am.Jur.2d, *supra*, § 6, p. 834, fn. 69.) Professor Natelson points to evidence tracing the condominium concept to medieval Germanic custom. By the 12th century, the towns of Germany had embraced the notion of separate ownership of individual stories in a building. (Natelson, Law of Property Owners Associations (1989) § 1.3.2, p. 20; see also Leyser, *The Ownership of Flats—A Comparative Study* (1958) 7 Int'l & Comp. L.Q. 31, 33; 15A Am.Jur.2d, *supra*, § 6, p. 834.) " 'Houses were horizontally divided, and specific parts so created—the stories, floors, and cellars—were held by different persons in separate ownership; this being associated, as a rule, with the community ownership of the building site and the portions of the building (walls, stairs, roof, etc.) that were used in common.' " (Huebner, History of Germanic Private Law (1918) p. 174, as quoted in Note, *Land Without Earth—The Condominium*, *supra*, 15 U.Fla. L.Rev. at p. 205, fn. 14.) Development of this innovative form of ownership in Germany may have been encouraged by two factors: "a vibrant middle class made the institution possible, and the cramped nature of life behind town walls made it desirable." (Natelson, Law of Property Owners Associations, *supra*, § 1.3.2.2, p. 20.)

The concept of "horizontal property" or "strata" ownership simply means that the area above land can be divided into a series of strata or planes capable of severed ownership, making the ownership of things affixed to land separable from the ownership of the land itself. (Natelson, Law of Property Owners Associations, *supra*, § 1.3.2, pp. 24-25; Ball, *Division into Horizontal Strata of the Landscape Above the Surface* (1930) 39 Yale L.J. 616.) This idea, however, was inconsistent with the view expressed in many European civil codes and at English common law that the owner of the soil possessed the exclusive right to control everything on, above, or beneath the land, and that fixtures attached to land therefore could not be severed from ownership of the land. (See Schwartz, *Condominium: A Hybrid Castle in the Sky* (1964) 44 B.U. L.Rev. 137, 141 [noting the traditional view that "whatever is attached to the land belongs to the land" and, consequently, to the person who owns the land itself]; Note, *Land Without Earth—The Condominium*, *supra*, 15 U.Fla. L.Rev. at pp. 205-206 [noting the general hostility expressed in European civil codes to the concept of horizontal property].)

Indeed, there was no *statutory* authority for the severing of real property ownership by planes or floors until 1804, when the French Civil Code (the Code Napoleon) acknowledged that "the different stories of a house [could] belong to different proprietors," and that in such cases "[t]he main walls and the roof [could be] at the charge of all the proprietors, each in proportion to the story belonging to him." (Quoted in Natelson, Law of Property Owners Associations, *supra*, § 1.3.2, pp. 24-25.)

Not until nearly 160 years later did the notion of shared ownership of real property gain general acceptance in the United States. This occurred after Congress, through the National Housing Act of 1961, made federal mortgage insurance available to condominium units so as to encourage and facilitate home ownership. (15A Am.Jur.2d, *supra*, § 7, p. 835; Note, *Judicial Review of Condominium Rulemaking* (1981) 94 Harv.L.Rev. 647, 653, fn. 33.) Why did it take so long for this country to accept the idea of horizontal property ownership? Perhaps because the United States was, until recent times, so sparsely populated—and undeveloped habitable land and building materials so affordable—that there was "no great physical need for superimposing one dwelling upon another." (Note, *Land Without Earth—The Condominium*, *supra*, 15 U.Fla. L.Rev. at p. 206; see also Leyser, *The Ownership of Flats—A Comparative Study*, *supra*, 7 Int'l & Comp. L.Q. at p. 31, fn. 3 [noting the similarly late development of shared ownership housing arrangements in another large, sparsely populated country—Australia.])

To divide a plot of land into interests severable by blocks or planes, the attorney for the land developer must prepare a declaration that must be recorded prior to the sale of any unit in the county where the land is located. (Natelson, *Consent, Coercion, and "Reasonableness" in Private Law: The Special Case of the Property Owners Association* (1990) 51 Ohio State L.J. 41, 47 [hereafter Natelson, *Consent, Coercion, and "Reasonableness"*].) The declaration, which is the operative document for the creation of any common interest development, is a collection of covenants, conditions and servitudes that govern the project. (*Ibid.*; see also 4B Powell, Real Property, *supra*, § 632.4[1] & [2], pp. 54-84, 54-92; 15A Am.Jur.2d, *supra*, § 14, p. 843.) Typically, the declaration describes the real property and any structures on the property, delineates the common areas within the project as well as the individually held lots or units, and sets forth restrictions pertaining to the use of the property. (15A Am.Jur.2d, *supra*, § 14, p. 843.)

Use restrictions are an inherent part of any common interest development and are crucial to the stable, planned environment of any shared ownership arrangement. (Note, *Community Association Use Restrictions: Applying the Business Judgment Doctrine* (1988) 64 Chi.-Kent L.Rev. 653, 673 [hereafter

Note, *Business Judgment*]; see also Natelson, *Consent, Coercion and "Reasonableness," supra*, 51 Ohio State L.J. at p. 47.) The viability of shared ownership of improved real property rests on the existence of extensive reciprocal servitudes, together with the ability of each co-owner to prevent the property's partition. (Natelson, Law of Property Owners Associations, *supra*, § 1.3.2.1, p. 19; see also Note, *Business Judgment, supra*, 64 Chi.-Kent L.Rev. at p. 673 [suggesting that medieval building societies, an early form of shared real property ownership, had failed for lack of enforceable regulations].)

The restrictions on the use of property in any common interest development may limit activities conducted in the common areas as well as in the confines of the home itself. (Reichman, *Residential Private Governments* (1976) 43 U.Chi. L.Rev. 253, 270; 15A Am.Jur.2d, *supra*, § 16, pp. 845-846.) Commonly, use restrictions preclude alteration of building exteriors, limit the number of persons that can occupy each unit, and place limitations on—or prohibit altogether—the keeping of pets. (4B Powell, Real Property, *supra*, § 632.5[11], p. 54-221; Reichman, *Residential Private Governments, supra*, at p. 270; Natelson, *Consent, Coercion, and "Reasonableness," supra*, 51 Ohio St. L.J. at p. 48, fn. 28 [as of 1986, 58 percent of highrise developments and 39 percent of townhouse projects had some kind of pet restriction]; see also *Noble* v. *Murphy* (1993) 34 Mass.App. 452 [612 N.E.2d 266] [enforcing condominium ban on pets]; *Dulaney Towers Maintenance Corp.* v. *O'Brey, supra*, 418 A.2d 1233 [upholding pet restriction]; *Wilshire Condominium Ass'n, Inc.* v. *Kohlbrand* (Fla.Dist.Ct.App. 1979) 368 So.2d 629 [same].)[5]

Restrictions on property use are not the only characteristic of common interest ownership. Ordinarily, such ownership also entails mandatory membership in an owners association, which, through an elected board of directors, is empowered to enforce any use restrictions contained in the project's declaration or master deed and to enact new rules governing the use and occupancy of property within the project. (Cal. Condominium and Planned Development Practice (Cont.Ed.Bar 1984) § 1.7, p. 13; Note, *Business Judgment, supra*, 64 Chi.-Kent L.Rev. at p. 653; Natelson, Law of Property Owners Associations, *supra*, § 3.2.2, p. 71 et seq.) Because of its considerable power in managing and regulating a common interest development, the governing board of an owners association must guard against the potential

---

[5]Even the dissent recognizes that pet restrictions have a long pedigree. (See dis. opn., *post*, p. 392, fn. 5, citing Crimmins, The Quotable Cat (1992) p. 58 [English nuns living in a nunnery prohibited in 1205 from keeping any pet except a cat].)

for the abuse of that power.[6] As Professor Natelson observes, owners associations "can be a powerful force for good or for ill" in their members' lives. (Natelson, *Consent, Coercion, and "Reasonableness," supra*, 51 Ohio St. L.J. at p. 43.) ▮ Therefore, anyone who buys a unit in a common interest development with knowledge of its owners association's discretionary power accepts "the risk that the power may be used in a way that benefits the commonality but harms the individual." (*Id.* at p. 67.) Generally, courts will uphold decisions made by the governing board of an owners association so long as they represent good faith efforts to further the purposes of the common interest development, are consistent with the development's governing documents, and comply with public policy. (*Id.* at p. 43.)

Thus, subordination of individual property rights to the collective judgment of the owners association together with restrictions on the use of real property comprise the chief attributes of owning property in a common interest development. As the Florida District Court of Appeal observed in *Hidden Harbour Estates, Inc.* v. *Norman* (Fla.Dist.Ct.App. 1975) 309 So.2d 180 [72 A.L.R.3d 305], a decision frequently cited in condominium cases: "[I]nherent in the condominium concept is the principle that to promote the health, happiness, and peace of mind of the majority of the unit owners since they are living in such close proximity and using facilities in common, each unit owner must give up a certain degree of freedom of choice which he [or she] might otherwise enjoy in separate, privately owned property. Condominium unit owners comprise a little democratic subsociety of necessity more restrictive as it pertains to use of condominium property than may be existent outside the condominium organization." (*Id.* at pp. 181-182; see also Leyser, *The Ownership of Flats—A Comparative Study, supra*, 7 Int'l & Comp. L.Q. at p. 38 [explaining the French system's recognition that "flat ownership" has limitations that considerably exceed those of "normal" real property ownership, "limitations arising out of the rights of the other flat owners."].)

Notwithstanding the limitations on personal autonomy that are inherent in the concept of shared ownership of residential property, common interest developments have increased in popularity in recent years, in part because they generally provide a more affordable alternative to ownership of a single-family home. (See *Frances T.* v. *Village Green Owners Assn.* (1986) 42 Cal.3d 490, 500, fn. 9 [229 Cal.Rptr. 456, 723 P.2d 573, 59 A.L.R.4th 447] [noting that common interest developments at that time accounted for as much as 70 percent of the new housing market in Los Angeles and San

---

[6]The power to regulate pertains to a "wide spectrum of activities," such as the volume of playing music, hours of social gatherings, use of patio furniture and barbecues, and rental of units. (Note, *Business Judgment, supra*, 64 Chi.-Kent L.Rev. at p. 669.)

Diego Counties]; *Laguna Royale Owners Assn.* v. *Darger* (1981) 119 Cal.App.3d 670, 681 [174 Cal.Rptr. 136]; Natelson, *Consent, Coercion and "Reasonableness,"* *supra*, 51 Ohio St. L.J. at pp. 42-43 [as of 1988, more than 30 million Americans lived in housing governed by owners associations]; see also McKenzie, *Welcome Home. Do as We Say.*, N.Y. Times (Aug. 18, 1994) p. 23A, col. 1 [stating that 32 million Americans are members of some 150,000 homeowners associations and predicting that between 25 to 30 percent of Americans will live in community association housing by the year 2000.])

██ One significant factor in the continued popularity of the common interest form of property ownership is the ability of homeowners to enforce restrictive CC&R's against other owners (including future purchasers) of project units. (Natelson, Law of Property Owners Associations, *supra*, § 1.3.2.1, p. 19; Note, *Business Judgment, supra*, 64 Chi.-Kent L.Rev. at p. 673.) Generally, however, such enforcement is possible only if the restriction that is sought to be enforced meets the requirements of equitable servitudes or of covenants running with the land. (Cal. Condominium and Planned Development Practice, *supra*, §§ 8.42-8.44, pp. 666-668; Note, *Covenants and Equitable Servitudes in California* (1978) 29 Hastings L.J. 545, 553-573.)

Restrictive covenants will run with the land, and thus bind successive owners, if the deed or other instrument containing the restrictive covenant particularly describes the lands to be benefited and burdened by the restriction and expressly provides that successors in interest of the covenantor's land will be bound for the benefit of the covenantee's land. Moreover, restrictions must relate to use, repair, maintenance, or improvement of the property, or to payment of taxes or assessments, and the instrument containing the restrictions must be recorded. (See § 1468; Advising Cal. Condominium and Homeowners Associations (Cont.Ed.Bar 1991) § 7.33, p. 342.)

Restrictions that do not meet the requirements of covenants running with the land may be enforceable as equitable servitudes provided the person bound by the restrictions had notice of their existence. (*Riley* v. *Bear Creek Planning Committee* (1976) 17 Cal.3d 500, 507 [131 Cal.Rptr. 381, 551 P.2d 1213]; Cal. Condominium and Planned Development Practice, *supra*, § 8.44, pp. 667-668.)

When restrictions limiting the use of property within a common interest development satisfy the requirements of covenants running with the land or of equitable servitudes, what standard or test governs their enforceability? In California, as we explained at the outset, our Legislature has made common

interest development use restrictions contained in a project's recorded declaration "enforceable . . . *unless unreasonable.*" (§ 1354, subd. (a), italics added.)

In states lacking such legislative guidance, some courts have adopted a standard under which a common interest development's recorded use restrictions will be enforced so long as they are "reasonable." (See *Riley* v. *Stoves* (1974) 22 Ariz.App. 223 [526 P.2d 747, 752, 68 A.L.R.3d 1229] [asking whether the challenged restriction provided "a reasonable means to accomplish the private objective"]; *Hidden Harbour Estates, Inc.* v. *Norman, supra,* 309 So.2d at p. 182 [to justify regulation, conduct need not be "so offensive as to constitute a nuisance"]; 15A Am.Jur.2d, *supra,* § 31, p. 861.) Although no one definition of the term "reasonable" has gained universal acceptance, most courts have applied what one commentator calls "equitable reasonableness," upholding only those restrictions that provide a reasonable means to further the collective "health, happiness and enjoyment of life" of owners of a common interest development. (Note, *Business Judgment, supra,* 64 Chi.-Kent L.Rev. at p. 655.) Others would limit the "reasonableness" standard only to those restrictions adopted by majority vote of the homeowners or enacted under the rulemaking power of an association's governing board, and would not apply this test to restrictions included in a planned development project's recorded declaration or master deed. Because such restrictions are presumptively valid, these authorities would enforce them regardless of reasonableness. The first court to articulate this view was the Florida Fourth District Court of Appeal.

In *Hidden Harbour Estates* v. *Basso* (Fla.Dist.Ct.App. 1981) 393 So.2d 637, the Florida court distinguished two categories of use restrictions: use restrictions set forth in the declaration or master deed of the condominium project itself, and rules promulgated by the governing board of the condominium owners association or the board's interpretation of a rule. (*Id.* at p. 639.) The latter category of use restrictions, the court said, should be subject to a "reasonableness" test, so as to "somewhat fetter the discretion of the board of directors." (*Id.* at p. 640.) Such a standard, the court explained, best assures that governing boards will "enact rules and make decisions that are reasonably related to the promotion of the health, happiness and peace of mind" of the project owners, considered collectively. (*Ibid.*)

By contrast, restrictions contained in the declaration or master deed of the condominium complex, the Florida court concluded, should not be evaluated under a "reasonableness" standard. (*Hidden Harbour Estates* v. *Basso, supra,* 393 So.2d at pp. 639-640.) Rather, such use restrictions are "clothed with a very strong presumption of validity" and should be upheld even if they

exhibit some degree of unreasonableness. (*Id.* at pp. 639, 640.) Nonenforcement would be proper only if such restrictions were arbitrary or in violation of public policy or some fundamental constitutional right. (*Id.* at pp. 639-640.) The Florida court's decision was cited with approval recently by a Massachusetts appellate court in *Noble* v. *Murphy, supra,* 612 N.E.2d 266.

In *Noble*, managers of a condominium development sought to enforce against the owners of one unit a pet restriction contained in the project's master deed. The Massachusetts court upheld the validity of the restriction. The court stated that "[a] condominium use restriction appearing in originating documents which predate the purchase of individual units" was entitled to greater judicial deference than restrictions "promulgated after units have been individually acquired." (*Noble* v. *Murphy, supra,* 612 N.E.2d at p. 270.) The court reasoned that "properly-enacted and evenly-enforced use restrictions contained in a master deed or original bylaws of a condominium" should be insulated against attack "except on constitutional or public policy grounds." (*Id.* at p. 271.) This standard, the court explained, best "serves the interest of the majority of owners [within a project] who may be presumed to have chosen not to alter or rescind such restrictions," and it spares overcrowded courts "the burden and expense of highly particularized and lengthy litigation." (*Ibid.*)

Indeed, giving deference to use restrictions contained in a condominium project's originating documents protects the general expectations of condominium owners "that restrictions in place at the time they purchase their units will be enforceable." (Note, *Judicial Review of Condominium Rulemaking, supra,* 94 Harv.L.Rev. 647, 653; Ellickson, *Cities and Homeowners' Associations* (1982) 130 U.Pa. L.Rev. 1519, 1526-1527 [stating that association members "unanimously consent to the provisions in the association's original documents" and courts therefore should not scrutinize such documents for ''reasonableness.''].) This in turn encourages the development of shared ownership housing—generally a less costly alternative to single-dwelling ownership—by attracting buyers who prefer a stable, planned environment. It also protects buyers who have paid a premium for condominium units in reliance on a particular restrictive scheme.

To what extent are these general principles reflected in California's statutory scheme governing condominiums and other common interest developments? We shall explore that in the next section.

III

In California, common interest developments are subject to the provisions of the Davis-Stirling Common Interest Development Act (hereafter Davis-Stirling Act or Act). (§ 1350 et seq.) The Act, passed into law in 1985,

consolidated in one part of the Civil Code certain definitions and other substantive provisions pertaining to condominiums and other types of common interest developments. (Stats. 1985, ch. 874, § 14, p. 2774.)

The Act enumerates the specific shared ownership arrangements that fall under the rubric "common interest development." (§ 1351, subd. (c)(1)-(4).)[7] It also sets out the requirements for establishing a common interest development (§ 1352), reserves to each homeowner in such a development limited authority to modify an individual unit (§ 1360), grants to the owners association of the development those powers necessary to the development's long-term operation (§§ 1363, 1364, 1365.5, 1366), and recognizes the right of homeowners collectively to alter or amend existing use restrictions, or to add new ones (§ 1356).

Section 1352 states that "whenever a separate interest coupled with an interest in the common area or membership in the association is, *or has been here*, conveyed" and a declaration, a condominium plan, and (when necessary) a subdivision map plan recorded, "[t]his title applies and a common interest development is created." (Italics added.)[8] Declarations recorded after January 1, 1986, the effective date of the Act, must include a legal description of the common interest development, a statement of the type of development (condominium project, stock cooperative, etc.), the name of the association charged with operating the development, and "the restrictions on the use or enjoyment of any portion of the common interest development." (§ 1353.)

Pertinent here is the Act's provision for the enforcement of use restrictions contained in the project's recorded declaration. That provision, subdivision (a) of section 1354, states in relevant part: "The covenants and restrictions in the declaration shall be enforceable equitable servitudes, *unless unreasonable*, and shall inure to the benefit of and bind all owners of separate interests in the development." (Italics added.)[9] To determine when a restrictive covenant included in the declaration of a common interest development cannot be enforced, we must construe section 1354. In doing so, our primary task is to ascertain legislative intent, giving the words of the statute their ordinary meaning. (*People* v. *Broussard* (1993) 5 Cal.4th 1067, 1071 [22 Cal.Rptr.2d 278, 856 P.2d 1134]; *Woods* v. *Young* (1991) 53 Cal.3d 315, 323 [279 Cal.Rptr. 613, 807 P.2d 455].) The words, however, must be read

[7]These are: community apartment projects, condominium projects, planned developments, and stock cooperatives.

[8]Thus, the Act governs common interest developments that predate its enactment.

[9]Section 1354 also confers standing on owners of separate interests in a development and on the association to enforce the equitable servitudes, and it sets out requirements for commencing a civil action.

BELOW IS A PASTE-OVER CRACK-AND-PEEL INSERT FOR CORRECTION OF AN ERROR IN THE BOUND VOLUME REPORT OF NAHRSTEDT v. LAKESIDE VILLAGE CONDOMINIUM ASSN. (1994) 8 CAL.4th 361, AT PAGE 378, LINES 13–23 (THE SECOND NEW PARAGRAPH ON THE PAGE).

Please remove the correction insert from the peel-off backing and position it to cover lines 13–23 of page 378.

Section 1352 states that "whenever a separate interest coupled with an interest in the common area or membership in the association is, *or has been*, conveyed" and a declaration, a condominium plan, and (when necessary) a subdivision map plan recorded, "[t]his title applies and a common interest development is created." (Italics added.)[8] Declarations recorded after January 1, 1986, the effective date of the Act, must include a legal description of the common interest development, a statement of the type of development (condominium project, stock cooperative, etc.), the name of the association charged with operating the development, and "the restrictions on the use or enjoyment of any portion of the common interest development." (§ 1353.)

in context, considering the nature and purpose of the statutory enactment. (*Woods* v. *Young*, *supra*, at p. 323; *California Mfrs. Assn.* v. *Public Utilities Com.* (1979) 24 Cal.3d 836, 844 [157 Cal.Rptr. 676, 598 P.2d 836].)

■ As we have mentioned in the preceding paragraph, section 1354 states that covenants and restrictions appearing in the recorded declaration of a common interest development are "enforceable equitable servitudes, unless unreasonable." The provision's express reference to "equitable servitudes" evidences the Legislature's intent that recorded use restrictions falling within section 1354 are to be treated as equitable servitudes. (See Cal. Condominium and Planned Development Practice, *supra*, § 8.40, p. 666 [giving this interpretation to former § 1355].)[10] Thus, although under general rules governing equitable servitudes a subsequent purchaser of land subject to restrictions must have actual notice of the restrictions, actual notice is not required to enforce recorded use restrictions covered by section 1354 against a subsequent purchaser. Rather, the inclusion of covenants and restrictions in the declaration recorded with the county recorder provides sufficient notice to permit the enforcement of such recorded covenants and restrictions as equitable servitudes. (See *Seaton* v. *Clifford* (1972) 24 Cal.App.3d 46, 50 [100 Cal.Rptr. 779] [recorded document of restrictions gives adequate notice to future grantees].)

■ Under the law of equitable servitudes, courts may enforce a promise about the use of land even though the person who made the promise has transferred the land to another. (See *Marra* v. *Aetna Construction Co.* (1940) 15 Cal.2d 375, 378 [101 P.2d 490].) The underlying idea is that a landowner's promise to refrain from particular conduct pertaining to land creates in the beneficiary of that promise "an equitable interest in the land of the promisor." (Rest., Property, § 539, com. *a*, p. 3227; 2 Pomeroy, Equity Jurisprudence (2d ed. 1886) § 689, quoted in *Hunt* v. *Jones* (1906) 149 Cal. 297, 301 [86 P. 686] [a grantee or purchaser with notice that premises are bound by a covenant " 'will be restrained from violating it.' "].) The doctrine is useful chiefly to enforce uniform building restrictions under a general plan for an entire tract of land or for a subdivision. (*Marra* v. *Aetna Construction Co.*, *supra*, at p. 378.) ■ "It is undoubted that when the owner of a subdivided tract conveys the various parcels in the tract by deeds containing appropriate language imposing restrictions on each parcel as part of a general plan of restrictions common to all the parcels and designed for their

---

[10]Before the enactment of section 1354 as part of the Davis-Stirling Act, a similar provision pertaining only to condominium units appeared in former section 1355. As relevant here, that statute provided: "The owner of a project shall, prior to the conveyance of any condominium therein, record a declaration of restrictions relating to such project, which restrictions shall be enforceable equitable servitudes where reasonable, and shall inure to and bind all owners of condominiums in the project." (Stats. 1963, ch. 860, § 3, p. 2092.)

mutual benefit, mutual equitable servitudes are thereby created in favor of each parcel as against all the others." (*Werner* v. *Graham* (1919) 181 Cal. 174, 183 [183 P. 945].)

In choosing equitable servitude law as the standard for enforcing CC&R's in common interest developments, the Legislature has manifested a preference in favor of their enforcement. This preference is underscored by the use of the word "shall" in the first phrase of section 1354: "The covenants and restrictions shall be enforceable equitable servitudes . . . ." (See *Common Cause* v. *Board of Supervisors* (1989) 49 Cal.3d 432, 443 [261 Cal.Rptr. 574, 777 P.2d 610]; *Long Beach Police Officers Assn.* v. *City of Long Beach* (1988) 46 Cal.3d 736, 743 [250 Cal.Rptr. 869, 759 P.2d 504] ["shall" is ordinarily mandatory].)

The Legislature did, however, set a condition for the mandatory enforcement of a declaration's CC&R's: a covenant, condition or restriction is "enforceable . . . *unless unreasonable*." (§ 1354, subd. (a), italics added.) The Legislature's use of the phrase "unless unreasonable" in section 1354 was a marked change from the prior version of that statutory provision, which stated that "restrictions shall be enforceable equitable servitudes *where reasonable*." (Former § 1355, italics added; see fn. 10, *ante*.) Under settled principles of statutory construction, such a material alteration of a statute's phrasing signals the Legislature's intent to give an enactment a new meaning. (*McDonough Power Equipment Co.* v. *Superior Court* (1972) 8 Cal.3d 527, 534, fn. 5 [105 Cal.Rptr. 330, 503 P.2d 1338].) Here, the change in statutory language, from "where reasonable" to "unless unreasonable," cloaked use restrictions contained in a condominium development's recorded declaration with a presumption of reasonableness by shifting the burden of proving otherwise to the party challenging the use restriction. (Cal. Condominium and Planned Development Practice, *supra*, § 1.9, p. 18 [stating that the change in statutory language "switches the burden to the person challenging the restriction to establish that it is unreasonable"]; Advising Cal. Condominium and Homeowners Associations, *supra*, § 7.34, p. 344 [same].)

How is that burden satisfied? To answer this question, we must examine the principles governing enforcement of equitable servitudes.

As noted earlier, equitable servitudes permit courts to enforce promises restricting land use when there is no privity of contract between the party seeking to enforce the promise and the party resisting enforcement. Like any promise given in exchange for consideration, an agreement to refrain from a particular use of land is subject to contract principles, under

which courts try "to effectuate the legitimate desires of the covenanting parties." (*Hannula* v. *Hacienda Homes* (1949) 34 Cal.2d 442, 444-445 [211 P.2d 302, 19 A.L.R.2d 1268].) When landowners express the intention to limit land use, "that intention should be carried out." (*Id.* at p. 444; Epstein, *Notice and Freedom of Contract in the Law of Servitudes* (1982) 55 So.Cal.L.Rev. 1353, 1359 ["We may not understand why property owners want certain obligations to run with the land, but as it is *their* land . . . some very strong reason should be advanced" before courts should override those obligations. (Original italics.)].)

Thus, when enforcing equitable servitudes, courts are generally disinclined to question the wisdom of agreed-to restrictions. (Note, *Covenants and Equitable Servitudes in California, supra,* 29 Hastings L.J. at p. 577, citing *Walker* v. *Haslett* (1919) 44 Cal.App. 394, 397-398 [186 P. 622].) This rule does not apply, however, when the restriction does not comport with public policy. (*Ibid.*) ■ Equity will not enforce any restrictive covenant that violates public policy. (See *Shelley* v. *Kraemer* (1948) 334 U.S. 1 [92 L.Ed. 1161, 68 S.Ct. 836, 3 A.L.R.2d 441] [racial restriction unenforceable]; § 53, subd. (b) [voiding property use restrictions based on "sex, race, color, religion, ancestry, national origin, or disability"].) Nor will courts enforce as equitable servitudes those restrictions that are arbitrary, that is, bearing no rational relationship to the protection, preservation, operation or purpose of the affected land. (See *Laguna Royale Owners Assn.* v. *Darger, supra,* 119 Cal.App.3d 670, 684.)

These limitations on the equitable enforcement of restrictive servitudes that are either arbitrary or violate fundamental public policy are specific applications of the general rule that courts will not enforce a restrictive covenant when "the harm caused by the restriction is so disproportionate to the benefit produced" by its enforcement that the restriction "ought not to be enforced." (Rest., Property, § 539, com. *f,* pp. 3229-3230; see also 4 Witkin, Summary of Cal. Law (9th ed. 1987) Real Property, § 494, pp. 671-672; Note, *Covenants and Equitable Servitudes in California, supra,* 29 Hastings L.J. at pp. 575-576.) When a use restriction bears no relationship to the land it burdens, or violates a fundamental policy inuring to the public at large, the resulting harm will always be disproportionate to any benefit.

Sometimes lesser burdens too can be so disproportionate to any benefit flowing from the restriction that the restriction "ought not to be enforced." (Rest., Property, § 539, com. *f,* p. 3230.) For instance, courts will not enforce a land use restriction when a change in surrounding properties effectively defeats the intended purpose of the restriction, rendering it of little benefit to the remaining property owners. (*Lincoln Sav. & Loan Assn.* v. *Riviera Estates*

*Assn.* (1970) 7 Cal.App.3d 449, 460 [87 Cal.Rptr. 150].) In such cases, enforcing the restriction would be oppressive or inequitable. (*Atlas Terminals, Inc.* v. *Sokol* (1962) 203 Cal.App.2d 191, 195 [21 Cal.Rptr. 293]; see generally, 7 Miller & Starr, California Real Estate (1990) Covenants and Restrictions, § 22:19, p. 575; Note, *Restrictive Covenants: Injunctions: Changed Conditions in the Neighborhood as a Bar to Enforcement of Equitable Servitudes* (1927) 16 Cal.L.Rev. 58.)

 As the first Restatement of Property points out, the test for determining when the harmful effects of a land-use restriction are so disproportionate to its benefit "is necessarily vague." (Rest., Property, § 539, com. *f*, p. 3230.) Application of the test requires the accommodation of two policies that sometimes conflict: "One of these is that [persons] should be required to live up to their promises; the other that land should be developed to its normal capacity." (*Ibid.*) Reconciliation of these policies in determining whether the burdens of a recorded use restriction are so disproportionate to its benefits depends on the effect of the challenged restriction on "promoting or limiting the use of land in the locality . . . ." (*Ibid.*)

From the authorities discussed above, we distill these principles: An equitable servitude will be enforced unless it violates public policy; it bears no rational relationship to the protection, preservation, operation or purpose of the affected land; or it otherwise imposes burdens on the affected land that are so disproportionate to the restriction's beneficial effects that the restriction should not be enforced.

 With these principles of equitable servitude law to guide us, we now turn to section 1354. As mentioned earlier, under subdivision (a) of section 1354 the use restrictions for a common interest development that are set forth in the recorded declaration are "enforceable equitable servitudes, unless unreasonable." In other words, such restrictions should be enforced unless they are wholly arbitrary, violate a fundamental public policy, or impose a burden on the use of affected land that far outweighs any benefit.

This interpretation of section 1354 is consistent with the views of legal commentators as well as judicial decisions in other jurisdictions that have applied a presumption of validity to the recorded land use restrictions of a common interest development. (*Noble* v. *Murphy, supra,* 612 N.E.2d 266, 270; *Hidden Harbour Estates* v. *Basso, supra,* 393 So.2d 637, 639-640; Note, *Judicial Review of Condominium Rulemaking, supra,* 94 Harv.L.Rev. 647, 653.) As these authorities point out, and as we discussed previously, recorded CC&R's are the primary means of achieving the stability and predictability so essential to the success of a shared ownership housing development. In general, then, enforcement of a common interest development's

recorded CC&R's will both encourage the development of land and ensure that promises are kept, thereby fulfilling both of the policies identified by the Restatement. (See Rest., Property, § 539, com. *f*, p. 3230.)

When courts accord a presumption of validity to all such recorded use restrictions and measure them against deferential standards of equitable servitude law, it discourages lawsuits by owners of individual units seeking personal exemptions from the restrictions. This also promotes stability and predictability in two ways. It provides substantial assurance to prospective condominium purchasers that they may rely with confidence on the promises embodied in the project's recorded CC&R's. And it protects all owners in the planned development from unanticipated increases in association fees to fund the defense of legal challenges to recorded restrictions.

How courts enforce recorded use restrictions affects not only those who have made their homes in planned developments, but also the owners associations charged with the fiduciary obligation to enforce those restrictions. (See *Posey* v. *Leavitt* (1991) 229 Cal.App.3d 1236, 1247 [280 Cal.Rptr. 568]; Advising Cal. Condominium and Homeowner Associations, *supra*, § 6.11. pp. 259-261.) When courts treat recorded use restrictions as presumptively valid, and place on the challenger the burden of proving the restriction "unreasonable" under the deferential standards applicable to equitable servitudes, associations can proceed to enforce reasonable restrictive covenants without fear that their actions will embroil them in costly and prolonged legal proceedings. Of course, when an association determines that a unit owner has violated a use restriction, the association must do so in good faith, not in an arbitrary or capricious manner, and its enforcement procedures must be fair and applied uniformly. (See *Ironwood Owners Assn. IX* v. *Solomon* (1986) 178 Cal.App.3d 766, 772 [224 Cal.Rptr. 18]; *Cohen* v. *Kite Hill Community Assn.* (1983) 142 Cal.App.3d 642, 650 [191 Cal.Rptr. 209].)

There is an additional beneficiary of legal rules that are protective of recorded use restrictions: the judicial system. Fewer lawsuits challenging such restrictions will be brought, and those that are filed may be disposed of more expeditiously, if the rules courts use in evaluating such restrictions are clear, simple, and not subject to exceptions based on the peculiar circumstances or hardships of individual residents in condominiums and other shared-ownership developments.

Contrary to the dissent's accusations that the majority's decision "fray[s]" the "social fabric" (dis. opn., *post*, p. 390), we are of the view that our social fabric is best preserved if courts uphold and enforce solemn written instruments that embody the expectations of the parties rather than treat them as

"worthless paper" as the dissent would (dis. opn., *post*, p. 396). Our social fabric is founded on the stability of expectation and obligation that arises from the consistent enforcement of the terms of deeds, contracts, wills, statutes, and other writings. To allow one person to escape obligations under a written instrument upsets the expectations of all the other parties governed by that instrument (here, the owners of the other 529 units) that the instrument will be uniformly and predictably enforced.

The salutary effect of enforcing written instruments and the statutes that apply to them is particularly true in the case of the declaration of a common interest development. As we have discussed, common interest developments are a more intensive and efficient form of land use that greatly benefits society and expands opportunities for home ownership. In turn, however, a common interest development creates a community of property owners living in close proximity to each other, typically much closer than if each owned his or her separate plot of land. This proximity is feasible, and units in a common interest development are marketable, largely because the recorded declaration of CC&R's assures owners of a stable and predictable environment.

Refusing to enforce the CC&R's contained in a recorded declaration, or enforcing them only after protracted litigation that would require justification of their application on a case-by-case basis, would impose great strain on the social fabric of the common interest development. It would frustrate owners who had purchased their units in reliance on the CC&R's. It would put the owners and the homeowners association in the difficult and divisive position of deciding whether particular CC&R's should be applied to a particular owner. Here, for example, deciding whether a particular animal is "confined to an owner's unit and create[s] no noise, odor, or nuisance" (dis. opn., *post*, p. 394) is a fact-intensive determination that can only be made by examining in detail the behavior of the particular animal and the behavior of the particular owner. Homeowners associations are ill-equipped to make such investigations, and any decision they might make in a particular case could be divisive or subject to claims of partiality.

Enforcing the CC&R's contained in a recorded declaration only after protracted case-by-case litigation would impose substantial litigation costs on the owners through their homeowners association, which would have to defend not only against owners contesting the application of the CC&R's to them, but also against owners contesting any case-by-case exceptions the homeowners association might make. In short, it is difficult to imagine what could more disrupt the harmony of a common interest development than the course proposed by the dissent.

## IV

Here, the Court of Appeal failed to consider the rules governing equitable servitudes in holding that Nahrstedt's complaint challenging the Lakeside Village restriction against the keeping of cats in condominium units stated a cause of action for declaratory relief. Instead, the court concluded that factual allegations by Nahrstedt that her cats are kept inside her condominium unit and do not bother her neighbors were sufficient to have the trial court decide whether enforcement of the restriction against Nahrstedt would be reasonable. For this conclusion, the court relied on two Court of Appeal decisions, *Bernardo Villas Management Corp.* v. *Black* (1987) 190 Cal.App.3d 153 [235 Cal.Rptr. 509] and *Portola Hills Community Assn.* v. *James* (1992) 4 Cal.App.4th 289 [5 Cal.Rptr.2d 580], both of which had invalidated recorded restrictions covered by section 1354.

In *Bernardo Villas*, the manager of a condominium project sued two condominium residents to enforce a restriction that prohibited them from keeping any "truck, camper, trailer, boat . . . or other form of recreational vehicle" in the carports. (190 Cal.App.3d at p. 154.) In holding that the restriction was unreasonable as applied to the clean new pickup truck with camper shell that the defendants used for personal transportation, the Court of Appeal observed that parking the truck in the development's carport would "not interfere with other owners' use or enjoyment of their property." (*Id.* at p. 155.)

Thereafter, a different division of the same district Court of Appeal used a similar analysis in *Portola Hills*. There, the court refused to enforce a planned community's landscape restriction banning satellite dishes against a homeowner who had installed a satellite dish in his backyard. After expressing the view that "[a] homeowner is allowed to prove a particular restriction is unreasonable as applied to his property," the court observed that the defendant's satellite dish was not visible to other project residents or the public, leading the court to conclude that the ban promoted no legitimate goal of the homeowners association. (4 Cal.App.4th at p. 293.)

At issue in both *Bernardo Villas Management Corp.* v. *Black, supra*, 190 Cal.App.3d 153, and *Portola Hills Community Assn.* v. *James, supra*, 4 Cal.App.4th 289, were recorded use restrictions contained in a common interest development's declaration that had been recorded with the county recorder. Accordingly, the use restrictions involved in these two cases were covered by section 1354, rendering them presumptively reasonable and enforceable under the rules governing equitable servitudes. As we have explained, courts will enforce an equitable servitude unless it violates a

fundamental public policy, it bears no rational relationship to the protection, preservation, operation or purpose of the affected land, or its harmful effects on land use are otherwise so disproportionate to its benefits to affected homeowners that it should not be enforced. In determining whether a restriction is "unreasonable" under section 1354, and thus not enforceable, the focus is on the restriction's effect on the project as a whole, not on the individual homeowner. Although purporting to evaluate the use restrictions in accord with section 1354, both *Bernardo Villas* and *Portola Hills* failed to apply the deferential standards of equitable servitude law just mentioned. Accordingly, to the extent they differ from the views expressed in this opinion, we disapprove *Bernardo Villas* and *Portola Hills*.

V

Under the holding we adopt today, the reasonableness or unreasonableness of a condominium use restriction that the Legislature has made subject to section 1354 is to be determined *not* by reference to facts that are specific to the objecting homeowner, but by reference to the common interest development as a whole. As we have explained, when, as here, a restriction is contained in the declaration of the common interest development and is recorded with the county recorder, the restriction is presumed to be reasonable and will be enforced uniformly against all residents of the common interest development *unless* the restriction is arbitrary, imposes burdens on the use of lands it affects that substantially outweigh the restriction's benefits to the development's residents, or violates a fundamental public policy.

Accordingly, here Nahrstedt could prevent enforcement of the Lakeside Village pet restriction by proving that the restriction is arbitrary, that it is substantially more burdensome than beneficial to the affected properties, or that it violates a fundamental public policy. For the reasons set forth below, Nahrstedt's complaint fails to adequately allege any of these three grounds of unreasonableness.

We conclude, as a matter of law, that the recorded pet restriction of the Lakeside Village condominium development prohibiting cats or dogs but allowing some other pets is not arbitrary, but is rationally related to health, sanitation and noise concerns legitimately held by residents of a high-density condominium project such as Lakeside Village, which includes 530 units in 12 separate 3-story buildings.

Nahrstedt's complaint alleges no facts that could possibly support a finding that the burden of the restriction on the affected property is so disproportionate to its benefit that the restriction is unreasonable and should

not be enforced. Also, the complaint's allegations center on Nahrstedt and her cats (that she keeps them inside her condominium unit and that they do not bother her neighbors), without any reference to the effect on the condominium development as a whole, thus rendering the allegations legally insufficient to overcome section 1354's presumption of the restriction's validity.

 Nahrstedt's complaint does contend that the restriction violates her right to privacy under the California Constitution, article I, section 1.[11] According to Nahrstedt, this state constitutional provision (enacted by voter initiative in 1972) guarantees her the right to keep cats in her Lakeside Village condominium notwithstanding the existence of a restriction in the development's originating documents recorded with the county recorder specifically disallowing cats or dogs in the condominium project. Because a land-use restriction in violation of a state constitutional provision presumably would conflict with public policy (see *Gantt* v. *Sentry* (1992) 1 Cal.4th 1083, 1094-1095 [4 Cal.Rptr.2d 874, 824 P.2d 680]), we construe Nahrstedt's contention as a claim that the Lakeside Village pet restriction violates a fundamental public policy and for that reason cannot be enforced. As we have pointed out earlier, courts will not enforce a land use restriction that violates a fundamental public policy. The pertinent question, therefore, is whether the privacy provision in our state Constitution implicitly guarantees condominium owners or residents the right to keep cats or dogs as household pets. We conclude that California's Constitution confers no such right.

 We recently held, in *Hill* v. *National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1 [26 Cal.Rptr.2d 834, 865 P.2d 633] that the privacy provision in our state Constitution does not "encompass all conceivable assertions of individual rights" or create "an unbridled right" of personal freedom. (*Id.* at pp. 35-36.) The legally recognized privacy interests that fall within the protection of the state Constitution are generally of two classes: (1) interests in precluding dissemination of confidential information (" 'informational privacy' "); and (2) interests in making personal decisions or in conducting personal activities free of interference, observation, or intrusion (" 'autonomy privacy' "). (*Id.* at p. 35.) The threshold question in deciding whether "established social norms safeguard a particular type of information or protect a personal decision from public or private intervention," we explained in *Hill*, must be determined from "the usual sources of positive law governing the right to privacy—common law development, constitutional development, statutory enactment, and the ballots arguments accompanying the Privacy Initiative." (*Id.* at p. 36.)

---

[11] That provision states: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and *privacy*." (Italics added.)

From these sources we discern no fundamental public policy that would favor the keeping of pets in a condominium project. There is no federal or state constitutional provision or any California statute that confers a general right to keep household pets in condominiums or other common interest developments.[12] There is nothing in the ballot arguments relating to the privacy provision in our state Constitution that would be of help to plaintiff's argument in this case. The ballot arguments focused on the conduct of government and business in " 'collecting and stockpiling unnecessary information . . . and misusing information gathered for one purpose in order to serve other purposes or to embarrass . . . .' " (*Hill* v. *National Collegiate Athletic Assn.*, *supra*, 7 Cal.4th at p. 21, quoting from the ballot arguments for initiative adopted by voters on Nov. 7, 1972 [Privacy Initiative]), and therefore lend no support to Nahrstedt. Nor does case law offer any support for the position that the recognized scope of autonomy privacy encompasses the right to keep pets: courts that have considered condominium pet restrictions have uniformly upheld them. (*Noble* v. *Murphy*, *supra*, 612 N.E.2d 266 [upholding total ban on pets]; *Wilshire Condominium Ass'n, Inc.* v. *Kohlbrand*, *supra*, 368 So.2d 629 [upholding pet restriction]; *Dulaney Towers Maintenance* v. *O'Brey*, *supra*, 418 A.2d 1233 [same].)

Our conclusion that Nahrstedt's complaint states no claim entitling her to declaratory relief disposes of her primary cause of action challenging enforcement of the Lakeside Village condominium project's pet restriction, but does not address other causes of action (for invasion of privacy, invalidation of assessments, injunctive relief, and seeking damages for emotional distress) revived by the Court of Appeal. Because the Court of Appeal's decision regarding those other causes of action may have been influenced by its conclusion that Nahrstedt had stated a claim for declaratory relief, we remand this case to the Court of Appeal so it can reconsider whether Nahrstedt's complaint is sufficient to state those other causes of action.

## CONCLUSION

In section 1354, the Legislature has specifically addressed the subject of the enforcement of use restrictions that, like the one in this case prohibiting

---

[12]With respect to either disabled individuals living in rented housing or elderly persons living in publicly funded housing, the situation is otherwise. The Legislature has declared its intent that, in specified circumstances, these two classes of Californians be allowed to keep pets. Thus, section 54.1, which guarantees equal access to housing accommodations to individuals with disabilities, permits landlords to refuse to rent to tenants who have dogs, *except* when the prospective tenant is a disabled person needing the services of a guide, service, or signal dog. (*Id.* at subd. (b)(5).) And, under Health and Safety Code section 19901, elderly residents in publicly funded housing are entitled to have up to two household pets.

Because this case does not involve a disabled person needing guide dog assistance or an elderly person living in public housing, we do not address the public policy implications of recorded CC&R's that are in conflict with these statutes.

the keeping of certain animals, are recorded in the declaration of a condominium or other common interest development. The Legislature has mandated judicial enforcement of those restrictions unless they are shown to be unreasonable when applied to the development as a whole.

Section 1354 requires courts determining the validity of a condominium use restriction in a recorded declaration to apply the deferential standards of equitable servitude law. These standards grant courts no unbridled license to question the wisdom of the restriction. Rather, courts must enforce the restriction unless the challenger can show that the restriction is unreasonable because it is arbitrary, violates a fundamental public policy, or imposes burdens on the use of the affected property that substantially outweigh the restriction's benefits.

By providing condominium homeowners with substantial assurance that their development's recorded use restrictions can be enforced, section 1354 promotes the stability and predictability so essential to the success of any common interest development. Persons who purchase homes in such a development typically submit to a variety of restrictions on the use of their property. In exchange, they obtain the security of knowing that all other homeowners in the development will be required to abide by those same restrictions. Section 1354 also protects the general expectations of condominium homeowners that they not be burdened with the litigation expense in defending case-by-case legal challenges to presumptively valid recorded use restrictions.

In this case, the pet restriction was contained in the project's declaration or governing document, which was recorded with the county recorder before any of the 530 units was sold. For many owners, the pet restriction may have been an important inducement to purchase into the development. Because the homeowners collectively have the power to repeal the pet restriction, its continued existence reflects their desire to retain it.

Plaintiff's allegations, even if true, are insufficient to show that the pet restriction's harmful effects substantially outweigh its benefits to the condominium development as a whole, that it bears no rational relationship to the purpose or function of the development, or that it violates public policy. We reverse the judgment of the Court of Appeal, and remand for further proceedings consistent with the views expressed in this opinion.

Lucas, C. J., Mosk, J., Baxter, J., George, J., and Werdegar, J., concurred.

**ARABIAN, J.,** Dissenting.—"There are two means of refuge from the misery of life: music and cats."[1]

I respectfully dissent. While technical merit may commend the majority's analysis,[2] its application to the facts presented reflects a narrow, indeed chary, view of the law that eschews the human spirit in favor of arbitrary efficiency. In my view, the resolution of this case well illustrates the conventional wisdom, and fundamental truth, of the Spanish proverb, "It is better to be a mouse in a cat's mouth than a man in a lawyer's hands."

As explained below, I find the provision known as the "pet restriction" contained in the covenants, conditions, and restrictions (CC&R's) governing the Lakeside Village project patently arbitrary and unreasonable within the meaning of Civil Code section 1354. Beyond dispute, human beings have long enjoyed an abiding and cherished association with their household animals. Given the substantial benefits derived from pet ownership, the undue burden on the use of property imposed on condominium owners who can maintain pets within the confines of their units without creating a nuisance or disturbing the quiet enjoyment of others substantially outweighs whatever meager utility the restriction may serve in the abstract. It certainly does not promote "health, happiness [or] peace of mind" commensurate with its tariff on the quality of life for those who value the companionship of animals. Worse, it contributes to the fraying of our social fabric.[3]

### 1. *The pleadings.*

I begin my analysis with the plaintiff's pleadings, the allegations of which must be accepted as true on review of an order sustaining a demurrer. (*Long Beach Equities, Inc.* v. *County of Ventura* (1991) 231 Cal.App.3d 1016, 1024 [282 Cal.Rptr. 877].) Moreover, in evaluating the sufficiency of the complaint at this stage of the proceedings, a reviewing court must "look to

---

[1]Albert Schweitzer.

[2]The majority invest substantial interpretive significance regarding the enforceability of condominium restrictions in the replacement of "where reasonable" in Civil Code former section 1355 with "unless unreasonable" in Civil Code section 1354. (See maj. opn., *ante*, at p. 380.) Other than the statutory language itself, however, they cite no evidence the Legislature considered this a "material alteration" or intended a "marked change" in the statute's interpretation. Although I fail to see other than a semantic distinction carrying little import as to legislative intent, I find the pet restriction at issue here unenforceable under either standard.

[3]The majority imply that if enough owners find the restriction too oppressive, they can act collectively to alter or rescind it. (Maj. opn., *ante*, at p. 389.) However, realistically speaking, implementing this alternative would only serve to exacerbate the divisiveness rampant in our society and to which the majority decision itself contributes.

substance, not to form" (*Menefee* v. *Oxnam* (1919) 42 Cal.App. 81, 96 [183 P. 379]; see, e.g., *Universal By-Product, Inc.* v. *City of Modesto* (1974) 43 Cal.App.3d 145, 151 [117 Cal.Rptr. 525]), construing the pleadings liberally, "with a view to substantial justice between the parties" (Code Civ. Proc., § 452).

In relevant part, plaintiff has alleged that she is the owner of a condominium unit located in Lakeside Village; that she has three cats which she brought with her when she moved there; that she maintains her cats entirely within the confines of her unit and has "never released [them] in any common area"; that they are "noiseless, create no nuisance, [and] have not destroyed any portion of [her] unit, or the common area"; and that they provide her companionship. She further alleges the homeowners association is seeking to enforce a recorded restriction that prohibits keeping any pets except domestic fish and birds.

The majority acknowledge that under their interpretation of Civil Code section 1354 "the test for determining when the harmful effects of a land-use restriction are disproportionate to benefit 'is necessarily vague.' [Citation.]" (Maj. opn., *ante*, at p. 382.) Nevertheless, in their view the foregoing allegations are deficient because they do not specifically state facts to "support a finding that the burden of the restriction on the affected property is so disproportionate to its benefit that the restriction is unreasonable and should not be enforced." (Maj. opn., *ante*, at pp. 386-387.) They also fail to make "any reference to the effect on the condominium development as a whole . . . ." (Maj. opn. *ante*, at p. 387.) This narrow assessment of plaintiff's complaint does not comport with the rule of liberal construction that should prevail on demurrer. (*Youngman* v. *Nevada Irrigation Dist.* (1969) 70 Cal.2d 240, 245 [74 Cal.Rptr. 398, 449 P.2d 462].) When considered less grudgingly, the pleadings are sufficient to allege that the pet restriction is unreasonable as a matter of law.

Generically stated, plaintiff challenges this restriction to the extent it precludes not only her but anyone else living in Lakeside Village from enjoying the substantial pleasures of pet ownership while affording no discernible benefit to other unit owners if the animals are maintained without any detriment to the latter's quiet enjoyment of their own space and the common areas. In essence, she avers that when pets are kept out of sight, do not make noise, do not generate odors, and do not otherwise create a nuisance, reasonable expectations as to the quality of life within the condominium project are not impaired. At the same time, taking into consideration the well-established and long-standing historical and cultural relationship between human beings and their pets and the value they impart (cf. Evid.

Code, § 452, subd. (g)), enforcement of the restriction significantly and unduly burdens the use of land for those deprived of their companionship. Considered from this perspective, I find plaintiff's complaint states a cause of action for declaratory relief.[4]

## 2. *The burden.*

Under the majority's construction of Civil Code section 1354, the pet restriction is unreasonable, and hence unenforceable, if the "burdens [imposed] on the affected land . . . are so disproportionate to the restriction's beneficial effects that the restriction should not be enforced." (Maj. opn., *ante*, at p. 382.) What, then, is the burden at issue here?

Both recorded and unrecorded history bear witness to the domestication of animals as household pets.[5] Throughout the ages, dogs and cats have provided human beings with a variety of services in addition to their companionship—shepherding flocks, guarding life and property, hunting game, ridding the house and barn of vermin. Of course, the modern classic example is the assist dog, which facilitates a sense of independence and security for disabled persons by enabling them to navigate their environment, alerting them to important sounds, and bringing the world within their reach.[6] Emotionally, they allow a connection full of sensation and delicacy of feeling.

[4]At the very least, plaintiff should be permitted to amend her pleadings. Under the judicial authority prevailing at the time she filed her complaint, the type of allegations now required by the majority's holding were unnecessary to state a cause of action for declaratory relief when challenging enforcement of CC&R's under the present circumstances. (See *Portola Hills Community Assn.* v. *James* (1992) 4 Cal.App.4th 289 [5 Cal.Rptr.2d 580]; *Bernardo Villas Management Corp.* v. *Black* (1987) 190 Cal.App.3d 153 [235 Cal.Rptr. 509].) Thus, in fairness, she should have the opportunity to rectify the deficiency in light of the majority's disapproval of these decisions. (See *Youngman* v. *Nevada Irrigation Dist., supra*, 70 Cal.2d at p. 245.)

[5]Archeologists in Israel found some of the earliest evidence of a domesticated animal when they unearthed the 12,000-year-old skeleton of a woman who was buried with her hand resting on the body of her dog. (Clutton-Brock, Dog (1991) p. 35.) Romans warned intruders *"Cave canem"* to alert them to the presence of canine protectors. (*Id.*, p. 34.) Cats were known to be household pets in Egypt 5,000 years ago and often mummified and entombed with their owners. (Clutton-Brock, Cat (1991) p. 46.) According to the English Nuns Rule in 1205, "Ye shall not possess any beast, my dear sisters, except only a cat." (Crimmins, The Quotable Cat (1992) p. 58.)

[6]Although it is possible only to estimate the total, well in excess of 10,000 individuals avail themselves of the benefits of guide, alert, and service dogs in California alone. (See Sen. Subcom. Interim Hg. on Guide, Signal, and Service Dogs (Nov. 15, 1990) pp. 1-42.) State law guarantees them the right to live with their animals free from discrimination on that basis. (See Gov. Code, § 12955, subd. (*l*) [impermissible discrimination under the Fair Employment and Housing Act (FEHA) "includes . . . *restrictive covenants*, zoning laws, denial of use permits, and other actions . . . that make housing opportunities unavailable." (Italics

Throughout the ages, art and literature, as well as mythology, depict humans in all walks of life and social strata with cats and dogs, illustrating their widespread acceptance in everyday life.[7] Some religions have even incorporated them into their worship.[8] Dogs and cats are also admired for the purity of their character traits.[9] Closer to home, our own culture is populated with examples of the well-established place pets have found in our hearts and homes.[10]

In addition to these historical and cultural references, the value of pets in daily life is a matter of common knowledge and understanding as well as extensive documentation. People of all ages, but particularly the elderly and the young, enjoy their companionship. Those who suffer from serious disease or injury and are confined to their home or bed experience a therapeutic, even spiritual, benefit from their presence.[11] Animals provide comfort at the death of a family member or dear friend, and for the lonely can offer a reason for living when life seems to have lost its meaning.[12] In recognition of these benefits, both Congress and the state Legislature have expressly guaranteed that elderly and handicapped persons living in public-assistance housing cannot be deprived of their pets. (12 U.S.C. § 1701r-1; Health & Saf. Code, § 19901.) Not only have children and animals always been natural companions, children learn responsibility and discipline from pet

---

added.)]; see also Civ. Code, § 53; cf. 42 U.S.C. §§ 3601, 3604(f)(3)(B) [federal fair housing act].) Thus, to the extent the pet restriction contains no exception for assist dogs, it clearly violates public policy. At oral argument, counsel for the association allowed that an individual who required assistance of this kind could seek a waiver of the pet restriction, although he in no manner assured that the association's board would necessarily accede to such an effort to enforce the mandate of FEHA. In any event, this "concession" only serves to prove the point of discriminatory impact: disabled persons who have dogs to assist them in normalizing their daily lives do not have the equal access to housing guaranteed under state law if they must go, hat in hand as an Oliver Twist supplicant, to request an association board's "permission" to live as normal a life as they are capable of with canine assistance.

[7]For example, poetry runs the gamut from the doggerel of Ogden Nash to T.S. Eliot's "Old Possum's Book of Practical Cats."

[8]Eastern religions often depict dogs as gods or temple guards. (See Clutton-Brock, Dog, *supra*, p. 35.) Ancient Egyptians considered the cat sacred, and their religion included the cat goddess Bastet. (See Clutton-Brock, Cat, *supra*, p. 47.)

[9]For example, the Odyssey chronicles the faithfulness of Odysseus's dog. The legendary terrier "Greyfriars' Bobby" is synonymous with loyalty. In 1601, when the Earl of Southampton was being held in the Tower of London, his cat is reputed to have located his master's cell and climbed down the chimney to join him during his imprisonment. (Clutton-Brock, Cat, *supra*, p. 16.) And military annals document the wartime bravery and courage of dogs in the K-9 Corps.

[10]The President and his family often set a national example in this regard. Chelsea Clinton's cat "Socks" is only the latest in a long line of White House pets, including Franklin Roosevelt's "Fala" and the Bushes' "Millie."

[11]See, e.g., Siegel, *Companion Animals: In Sickness and in Health* (1993) 49 Journal of Social Issues 157.

[12]See, e.g., Waltham Symposium 20, Pets, Benefits and Practice (BVA Publications 1990).

ownership while developing an important sense of kindness and protection for animals.[13] Single adults may find certain pets can afford a feeling of security. Families benefit from the experience of sharing that having a pet encourages. While pet ownership may not be a fundamental right as such, unquestionably it is an integral aspect of our daily existence, which cannot be lightly dismissed and should not suffer unwarranted intrusion into its circle of privacy.

### 3. *The benefit.*

What is gained from an uncompromising prohibition against pets that are confined to an owner's unit and create no noise, odor, or nuisance?

To the extent such animals are not seen, heard, or smelled any more than if they were not kept in the first place, there is no corresponding or concomitant benefit. Pets that remain within the four corners of their owners' condominium space can have no deleterious or offensive effect on the project's common areas or any neighboring unit. Certainly, if other owners and residents are totally *unaware* of their presence, prohibiting pets does not in any respect foster the "health, happiness [or] peace of mind" of anyone except the homeowners association's board of directors, who are thereby able to promote a form of sophisticated bigotry. In light of the substantial and disproportionate burden imposed for those who must forego virtually any and all association with pets, this lack of benefit renders a categorical ban unreasonable under Civil Code section 1354.

The proffered justification is all the more spurious when measured against the terms of the pet restriction itself, which contains an exception for domestic fish and birds. A squawking bird can readily create the very kind of disturbance supposedly prevented by banning other types of pets. At the same time, many animals prohibited by the restriction, such as hamsters and the like, turtles, and small reptiles, make no sound whatsoever. Disposal of bird droppings in common trash areas poses as much of a health concern as cat litter or rabbit pellets, which likewise can be handled in a manner that avoids potential problems. Birds are also known to carry disease and provoke allergies. Neither is maintaining fish without possible risk of interfering with the quiet enjoyment of condominium neighbors. Aquarium water must be changed and disposed of in the common drainage system. Leakage from a fish tank could cause serious water damage to the owner's unit, those below, and common areas. Defendants and the majority purport such solicitude for the "health, sanitation and noise concerns" of other unit owners, but

---

[13]See, e.g., Melson, *The Benefits of Animals to Our Lives* (Fall 1990) People, Animals, Environment at pages 15-17.

fail to explain how the possession of pets, such as plaintiff's cats, under the circumstances alleged in her complaint, jeopardizes that goal any more than the fish and birds expressly allowed by the pet restriction. This inconsistency underscores its unreasonableness and discriminatory impact.[14]

### 4. *The majority's burden/benefit analysis.*

From the statement of the facts through the conclusion, the majority's analysis gives scant acknowledgment to any of the foregoing considerations but simply takes refuge behind the "presumption of validity" now accorded *all* CC&R's irrespective of subject matter. They never objectively scrutinize defendants' blandishments of protecting "health and happiness" or realistically assess the substantial impact on affected unit owners and *their* use of *their* property. As this court has often recognized, "deference is not abdication." (*People* v. *McDonald* (1984) 37 Cal.3d 351, 377 [208 Cal.Rptr. 236, 690 P.2d 709, 46 A.L.R.4th 1011].) Regardless of how limited an inquiry is permitted under applicable law, it must nevertheless be made.

Here, such inquiry should start with an evaluation of the interest that will suffer upon enforcement of the pet restriction. In determining the "burden on the use of land," due recognition must be given to the fact that this particular "use" transcends the impersonal and mundane matters typically regulated by condominium CC&R's, such as whether someone can place a doormat in the hallway or hang a towel on the patio rail or have food in the pool area, and reaches the very quality of life of hundreds of owners and residents. Nonetheless, the majority accept uncritically the proffered justification of preserving "health and happiness" and essentially consider only one criterion to determine enforceability: was the restriction recorded in the original declaration?[15] If so, it is "presumptively valid," unless in violation of public policy. Given the application of the law to the facts alleged and by an

---

[14]On a related point, the association rules and regulations already contain a procedure for dealing with problems arising from bird and fish ownership. There appears no reason it could not be utilized to deal with similar concerns about other types of pets such as plaintiff's cats.

[15]The majority purport to rely on several out-of-state cases to support their conclusions as to the validity of the pet restriction. These decisions are either distinguishable or reflect the same lack of objective analysis. *Hidden Harbour Estates, Inc.* v. *Norman* (Fla.Dist.Ct.App. 1975) 309 So.2d 180 [72 A.L.R.3d 305], involved a prohibition against the consumption of alcoholic beverages in the condominium project club house, one of the *common areas* used by all the owners. *Hidden Harbour Estates* v. *Basso* (Fla.Dist.Ct.App. 1981) 393 So.2d 637 likewise did not concern a restriction on pets but a ban on the construction of private wells, which had the potential for creating serious salination problems in the *common* drinking water. Of those cases involving pet restrictions, only *Noble* v. *Murphy* (1993) 34 Mass.App. 452 [612 N.E.2d 266] dealt with a categorical prohibition (See *Dulaney Towers Maintenance* v. *O'Brey* (1980) 46 Md.App. 464 [418 A.2d 1233]; *Wilshire Condominium Ass'n, Inc.* v. *Kohlbrand* (Fla.Dist.Ct.App. 1979) 368 So.2d 629.) The court there also failed to give any consideration to the qualitative nature of the restriction or the burden it imposed on those

inversion of relative interests, it is difficult to hypothesize any CC&R's that would not pass muster.[16] Such sanctity has not been afforded any writing save the commandments delivered to Moses on Mount Sinai, and they were set in stone, not upon worthless paper.

Moreover, unlike most conduct controlled by CC&R's, the activity at issue here is strictly confined to the owner's interior space; it does not in any manner invade other units or the common areas. Owning a home of one's own has always epitomized the American dream. More than simply embodying the notion of having "one's castle," it represents the sense of freedom and self-determination emblematic of our national character. Granted, those who live in multi-unit developments cannot exercise this freedom to the same extent possible on a large estate. But owning pets that do not disturb the quiet enjoyment of others does not reasonably come within this compromise. Nevertheless, with no demonstrated or discernible benefit, the majority arbitrarily sacrifice the dream to the tyranny of the "commonality."

### 5. Conclusion.

Our true task in this turmoil is to strike a balance between the governing rights accorded a condominium association and the individual freedom of its members. To fulfill that function, a reviewing court must view with a skeptic's eye restrictions driven by fear, anxiety, or intolerance. In any community, we do not exist in vacuo. There are many annoyances which we tolerate because not to do so would be repressive and place the freedom of others at risk.

In contravention, the majority's failure to consider the real burden imposed by the pet restriction unfortunately belittles and trivializes the interest at stake here. Pet ownership substantially enhances the quality of life for those who desire it. When others are not only undisturbed by, but completely unaware of, the presence of pets being enjoyed by their neighbors, the balance of benefit and burden is rendered disproportionate and unreasonable, rebutting any presumption of validity. Their view, shorn of grace and guiding philosophy, is devoid of the humanity that must temper the interpretation and application of all laws, for in a civilized society that is the source

---

arbitrarily deprived of the opportunity to own pets that could be confined to their units and kept without disturbing the quiet enjoyment of other unit owners.

[16]Under the facts of this case, the majority do more than simply accord the restriction a presumption of reasonableness. They encourage and endorse the enforcing body to disregard the privacy interests of law-abiding property owners. If pets are maintained in the manner alleged in plaintiff's complaint, then only snoopers are in a position to claim a violation of the restriction. .

of their authority. As judicial architects of the rules of life, we better serve when we construct halls of harmony rather than walls of wrath.

I would affirm the judgment of the Court of Appeal.