[No. G038758. Fourth Dist., Div. Three. June 10, 2008.]

GOLDEN RAIN FOUNDATION, Plaintiff and Appellant, v.
CAROL FRANZ et al., Defendants and Respondents.

**COUNSEL**

Pray, Price, Williams & Picking, William A. Williams and Jay H. Picking for Plaintiff and Appellant.

Fiore, Racobs & Powers, Richard S. Fiore, John R. MacDowell and Alejandro Portales for Seal Beach Mutual Nos. One–Twelve and Fifteen–Seventeen as Amici Curiae for Plaintiff and Appellant.

Shannon M. Walpole; Bell, Rosenberg & Hughes and Robert Rosenberg for Golden Rain Foundation of Walnut Creek as Amicus Curiae for Plaintiff and Appellant.

Crowell & Moring and Steven P. Rice for Defendants and Respondents Carol Franz, Richard Braun, Edmund Brian Marineau, Clara M. Vanderzee-Bos, Edmund Loritz and Jacklyn E. Shaw.

Matison & Margolese and Wayne Hunkins for Defendant and Respondent David Lyon.

## OPINION

**IKOLA, J.**—Plaintiff Golden Rain Foundation (GRF) appeals from a judgment for defendants Carol Franz, Richard Braun, Edmund Brian Marineau, Clara M. Vanderzee-Bos, Edmund Loritz, Jacklyn E. Shaw, and David Lyon. The court found that GRF is an "association" subject to the Davis-Stirling Common Interest Development Act (Civ. Code, § 1350 et seq.) (the Davis-Stirling Act).[1] We agree, and affirm.

### FACTS

*GRF and Leisure World*

GRF is a California nonprofit corporation formed in 1961. Its articles of incorporation state that it was formed "[t]o engage primarily and specifically in providing services and furnishing community facilities to housing operated on a cooperative or other basis and to the occupants thereof." To that end, GRF sponsored and formed 16 entities known as Seal Beach Mutual Nos. One through Seventeen (the Mutuals)—there is no Mutual No. Thirteen. Mutuals Nos. One through Sixteen are California corporations formed as stock cooperatives. Mutual No. Seventeen is a California nonprofit mutual benefit corporation formed as a condominium project. GRF sold parcels of property in Seal Beach to the Mutuals, which built multiunit residential buildings and associated common areas on them.

GRF is the trustee of the Golden Rain Foundation Trust, created by a declaration of trust recorded in 1962. The declaration provides, "[GRF's] present and proposed operations include (but are not limited to): [¶] (1) Sponsorship of TRUSTOR and other corporations formed primarily to provide cooperative apartment housing within the area of 540 acres more or less now known as Rossmoor Leisure World in Seal Beach, California . . . ." The original trustor and beneficiary is Seal Beach Mutual No. One. The declaration contemplates that each other Mutual may "become an additional trustor and beneficiary hereunder by . . . adopting and agreeing to the terms

---

[1] All further statutory references are to the Civil Code unless otherwise stated.

of this instrument." Every Mutual has since adopted the terms of the declaration of trust and is bound by it.

Pursuant to the declaration of trust, GRF retains title as trustee to "common facilities" for the benefit of the Mutuals. The common facilities include the streets needed to access the residential buildings, administration buildings, utility lines, a golf course, a clubhouse, and other property. GRF maintains the common facilities, as required by the declaration, and makes them available to the Mutuals' residents. GRF also owns nontrust property including a library and other facilities made available to the residents.

Collectively, the property owned by the Mutuals, the property to which GRF holds title as trustee, and the nontrust property owned by GRF, is commonly known as Leisure World Seal Beach, or simply Leisure World.[2] Leisure World is a prominent senior citizen community. A person wishing to live in Leisure World must buy a share of Mutual stock (or a condominium unit in Mutual No. Seventeen) and join GRF. Residents enter into written occupancy agreements with their Mutuals.

While the Mutuals are contractually responsible for maintaining their residential buildings and common areas, they rely upon GRF to perform management and maintenance services. The declaration of trust provides, "[GRF] shall perform for the benefit of all [the Mutuals] and their members all duties imposed upon [GRF] under separate written Agreement with . . . Mutual No. One and under any other written agreements of similar nature hereinafter entered into by [GRF] with other [Mutuals]." The management agreement with Mutual No. One requires GRF to, among other things, oversee final construction of the residential buildings, pay the mortgages, maintain the Mutual's buildings and grounds, contract for utilities and "other necessary services," maintain insurance, comply with requests by governmental authorities, coordinate each resident's relocation, inspect each unit, handle the residents' service requests, collect the residents' monthly assessments, allocate the collected funds to specified reserve and expense accounts, pay all operating and maintenance expenses, maintain the Mutual's records and books, submit accountings to the Mutual, prepare the Mutual's operating budgets, and otherwise "operate and maintain the Project according to the highest standards achievable . . . ." Long-standing management agreements require GRF to provide a host of similar services to the other Mutuals. GRF stated in its 2003 Annual Report, "[t]he sole purpose for the existence of

---

[2] The parties agree Leisure World Seal Beach is not related to other senior citizen communities also commonly known as Leisure World. (See *Finley v. Superior Court* (2000) 80 Cal.App.4th 1152, 1155 [96 Cal.Rptr.2d 128] [discussing "Leisure World, a senior citizens community in Laguna Hills," and noting, "Golden Rain Foundation of Laguna Hills (Golden Rain) functions as a sort of master homeowners association"].)

[GRF] is to provide management, accounting and maintenance services to the sixteen mutual corporations and to care for the community facilities."

The declaration of trust and the written management agreements allow GRF to charge the Mutuals for its management services, at cost and for no profit, and similarly to charge the residents for costs incurred maintaining the common facilities. GRF incorporates these charges into a monthly assessment. The residents pay their monthly assessment directly to GRF.

Each November, GRF sends an annual letter to each resident. The letter contains GRF's budget, the budget for the recipient's Mutual, legal disclosures, alternative dispute resolution provisions, and other information. GRF acknowledges in the letters that it is required to send them by the Davis-Stirling Act. In at least one letter, GRF refers to the residents as "owner[s] in a Common Interest Development under [the Davis-Stirling] Act" and states, "Leisure World Seal Beach, [GRF], and the [Mutuals] are subject to a California law known as the 'Common Interest Development Law,' also known as the 'Davis-Stirling Common Interest Development Act.' "

The letters instruct residents contemplating legal action against GRF to comply with the Davis-Stirling Act's alternative dispute resolution provisions. GRF states in the letters, in reference to those provisions, "[t]he association herein referred to relates to[,] as to the Mutual Corporations, the Mutual, and as [to] the Golden Rain Foundation, the Foundation."

*The Litigation*

Defendants are among the 9,000 residents of Leisure World and members of GRF. They sought various documents from GRF pursuant to the Davis-Stirling Act and other statutes. GRF refused the document requests. Defendants initiated small claims actions, in which the courts found GRF wrongly withheld the documents and awarded damages to defendants. The Superior Court affirmed these decisions.

GRF, undeterred, filed this action to obtain a declaration it is not subject to penalties pursuant to the Davis-Stirling Act for failing to produce the requested documents. Though GRF produced the documents before trial, the parties continued to seek a declaration whether GRF is an "association" pursuant to the Davis-Stirling Act. The court conducted a bench trial, received lengthy stipulations of fact and over 150 stipulated exhibits, and heard live testimony. It issued a 20-page statement of decision, finding that GRF is an "association" governed by the Davis-Stirling Act. It entered judgment accordingly.

## DISCUSSION

GRF contends the court wrongly found it is an association subject to the Davis-Stirling Act. This issue turns largely on the nature of GRF's relationship to Leisure World and whether Leisure World is a common interest development pursuant to the act. We defer to the court's factual findings regarding the relationship between GRF and Leisure World when they are supported by substantial evidence, but independently construe the act. (*Benninghoff v. Superior Court* (2006) 136 Cal.App.4th 61, 66 [38 Cal.Rptr.3d 759].)

Our Supreme Court has explained the advance of the common interest development. "[C]ondominiums, cooperatives, and planned-unit developments with homeowners associations have become a widely accepted form of real property ownership. These ownership arrangements are known as 'common interest' developments. [Citations.] The owner not only enjoys many of the traditional advantages associated with individual ownership of real property, but also acquires an interest in common with others in the amenities and facilities included in the project. It is this hybrid nature of property rights that largely accounts for the popularity of these new and innovative forms of ownership . . . ." (*Nahrstedt v. Lakeside Village Condominium Assn.* (1994) 8 Cal.4th 361, 370 [33 Cal.Rptr.2d 63, 878 P.2d 1275] (*Nahrstedt*).)

"In California, common interest developments are subject to the provisions of the Davis-Stirling Common Interest Development Act . . . . [Citation.] The Act, passed into law in 1985, consolidated in one part of the Civil Code certain definitions and other substantive provisions pertaining to condominiums and other types of common interest developments. [Citation.] [¶] The Act enumerates the specific shared ownership arrangements that fall under the rubric 'common interest development.' [Citation.] It also sets out the requirements for establishing a common interest development . . . [and] grants to the owners association of the development those powers necessary to the development's long-term operation . . . ." (*Nahrstedt, supra*, 8 Cal.4th at pp. 377–378, fn. omitted.)

The Davis-Stirling Act defines an "association" as "a nonprofit corporation or unincorporated association created for the purpose of managing a common interest development." (§ 1351, subd. (a).) GRF concedes it is a nonprofit corporation. The issues remaining are whether GRF was "created for the purpose of managing" Leisure World, and whether Leisure World is a common interest development.

*Substantial Evidence Supports the Finding GRF Was Created to Manage Leisure World*

GRF's governing documents support the court's finding that "the only purpose GRF has ever had, from its inception to the present, is to manage Leisure World." GRF's articles of incorporation explain that it was formed "[t]o engage primarily and specifically in providing services and furnishing community facilities to housing operated on a cooperative or other basis and to the occupants thereof"—i.e., to provide services to the Mutuals and the residents. The declaration of trust similarly provides that GRF was "formed primarily for the purpose of providing services and furnishing community facilities" to the Mutuals and the residents. According to the declaration, GRF's operations include sponsoring the Mutuals, conveying their parcels to them, constructing the common facilities for them, and maintaining the common facilities for the Mutuals and the residents. The declaration further provides it was executed to guarantee "the operation and management" of the common facilities by GRF.

GRF's management agreements with the Mutuals bolster the court's conclusion. The declaration of trust provides, "[GRF] shall perform for the benefit of all [the Mutuals] and their members all duties imposed upon [GRF] under separate written Agreement with . . . Mutual No. One and under any other written agreements of similar nature hereinafter entered into by [GRF] with other [Mutuals]." An attached agreement provides, "[GRF] shall operate and manage the community facilities and maintain and repair the private streets, and provide administrative, recreational and medical services for the benefit of the members of the [Mutuals] at cost and on a nonprofit basis." Subsequent management agreements require GRF to provide the Mutuals with the long list of management services noted above, such as maintaining their files, handling their finances and banking, and providing their property management services.

GRF's administrator confirmed it manages the Mutuals. He testified GRF has entered into a management agreement with each Mutual, whereby GRF provides "[a]dministrative services, maintenance services, accounting services, security, transportation, rule enforcement, and various other administrative functions for stockholder-related activities." He further testified GRF provides management services including stock transfer services, file maintenance, and contract supervision. While GRF has 225 employees to carry out its managerial duties, the administrator conceded the Mutuals have no staff to perform administrative functions.

Unsurprisingly, the parties stipulated GRF performs most, if not all, of the Mutual's administrative duties. They stipulated GRF provides contract management, property management, financial, payroll, file maintenance, and stock

transfer services to the Mutuals. They further stipulated GRF has a staff of more than 200 administrators, property managers, and other personnel; the Mutuals have no permanent staff. Equally important is what GRF does *not* do. GRF does not have any independent operations other than servicing the Mutuals and maintaining the common facilities. The parties stipulated, "[GRF] has no other business except that which relates to Seal Beach Leisure World."

Finally, GRF has acknowledged it was created to manage Leisure World. It stated in its 2003 annual report, "[t]he sole purpose for the existence of [GRF] is to provide management, accounting and maintenance services to the sixteen mutual corporations and to care for the community facilities." Going a step further, GRF has even acknowledged it is an "association" subject to the Davis-Stirling Act. It stated in a letter to the residents, "Leisure World Seal Beach, [GRF], and the [Mutuals] are subject to a California law known as the 'Common Interest Development Law,' also known as the 'Davis-Stirling Common Interest Development Act.' " It repeatedly stated in its alternative dispute resolution letters to residents sent pursuant to the Davis-Stirling Act, "[t]he association herein referred to relates to[,] as to the Mutual Corporations, the Mutual, and as [to] the Golden Rain Foundation, the Foundation."

GRF unpersuasively contends it does not manage Leisure World because it does not manage the Mutuals' residential buildings and common areas. It notes the declaration of trust requires GRF to manage only the common facilities, not the Mutuals' property. It further notes the Mutuals' articles of incorporation and bylaws require them to manage their own property. Finally, GRF claims it was not "created for the purpose" of managing Leisure World because it entered the management contracts *after* its creation; moreover, the management contracts can be terminated.

GRF exalts form over substance. Managing the Mutuals was at the core of GRF's formation. Its articles of incorporation provide it will "engage primarily and specifically in *providing services* and furnishing community facilities" to the Mutuals and their residents. (Italics added.) The declaration of trust provides GRF was "formed primarily for *the purpose of providing services* and furnishing community facilities" to the Mutuals and the residents. (Italics added.) The same three persons formed both GRF and Seal Beach Mutual No. One and, less than three months after Seal Beach Mutual No. One transfered the first soon-to-be Leisure World property to the trust by recording the declaration of trust, one of those persons executed the first GRF-Mutual management agreement on behalf of both GRF and Seal Beach Mutual No. One. Similar management agreements between GRF and the other Mutuals followed thereafter. The management agreements require GRF to manage the residential buildings and perform substantially all administrative functions. GRF in fact provides all those services for the Mutuals; it has no

other business. As GRF aptly conceded in its annual report, "[t]he sole purpose for the existence of [GRF] is to provide management, accounting and maintenance services to the sixteen mutual corporations and to care for the community facilities."

■ In sum, substantial evidence shows GRF was created to manage the Mutuals' residential buildings, their common areas, and its own common facilities. The court correctly found GRF was created to manage Leisure World.

GRF alternatively contends that it manages Leisure World as an agent of the Mutuals, not as an association. The Davis-Stirling Act defines a "managing agent" as "a person or entity who, for compensation or in expectation of compensation, exercises control over the assets of a common interest development." (§ 1363.1, subd. (b).) But the declaration of trust bars GRF from receiving any compensation for managing the common facilities, other than recouping its expenses on an at-cost basis. It provides that GRF "shall receive no profits or other compensation for any of its services rendered as trustee, but shall receive full reimbursement for its costs . . . ." And GRF does more than merely provide management services. It holds title to common facilities pursuant to the declaration of trust. GRF's own expert witness on the customs and practices of common interest developments conceded at trial that GRF is "unique." To his knowledge, no other purported management company for a common interest development holds title to property in the community it manages, charges initiation fees to residents, or requires residents to acquire a membership in the management company.

*The Court Correctly Found Leisure World Is a Common Interest Development*

Because substantial evidence supports the finding GRF is a nonprofit association created to manage Leisure World Seal Beach, we now independently construe the Davis-Stirling Act to decide whether the court correctly found Leisure World is a common interest development. Three provisions of that act are relevant: sections 1351, 1352, and 1353.

■ Section 1351 defines " '[c]ommon interest development' " as "any of the following: [¶] (1) A community apartment project. [¶] (2) A condominium project. [¶] (3) A planned development. [¶] (4) A stock cooperative." (§ 1351, subd. (c).) Leisure World comprises one condominium project and 15 stock cooperatives, satisfying the act's definition of common interest development. GRF contends a common interest development cannot comprise a *complex* of condominiums and stock cooperatives, but it offers no support for this construction. Moreover, another provision of the Davis-Stirling Act expressly contemplates that a common interest development may comprise "a community apartment project, condominium project, planned development, stock cooperative, *or combination thereof.*" (§ 1353, subd. (a)(1), italics added.)

Section 1352 conditions the creation of a common interest development upon (1) the conveyance of certain interests, and (2) the recordation of certain documents. It provides, "This title applies and a common interest development is created whenever a separate interest coupled with an interest in the common area or membership in the association is, or has been, conveyed, provided, all of the following are recorded: [¶] (a) A declaration. [¶] (b) A condominium plan, if any exists. [¶] (c) A final map or parcel map, if Division 2 (commencing with Section 66410) of Title 7 of the Government Code requires the recording of either a final map or parcel map for the common interest development." (§ 1352.) Leisure World meets these conditions.

■ First, Leisure World residents are conveyed the required "separate interest coupled with an interest in the common area or membership in the association . . . ." (§ 1352.) A separate interest in a condominium means "an individual unit" (§ 1351, subd. (*l*)(2)), i.e., an interest in space within boundaries described on a recorded parcel map or condominium plan. (§ 1351, subd. (f).) A separate interest in a stock cooperative means "the exclusive right to occupy a portion of the real property," as "evidenced by a share of stock, a certificate of membership, or otherwise." (§ 1351, subds. (*l*)(4), (m).) Each resident of Leisure World's condominium receives exclusive title to a specific condominium unit, as described on a recorded condominium plan. Each resident of Leisure World's stock cooperatives receives a share of stock in their Mutual and the exclusive right to occupy a unit pursuant to an occupancy agreement. Thus, each resident receives an appropriate separate interest. And each separate interest is "coupled with . . . membership in the association"—namely, GRF. (§ 1352.)

Second, the necessary documents have been recorded. A condominium plan was recorded for Mutual No. Seventeen in 1980, and amended pursuant to a recorded document in 1982. (§ 1352, subd. (b).) Subdivision maps for the tracts containing Mutual Nos. One through Twelve and Fourteen through Sixteen were also recorded. The Seal Beach city engineer stamped each recorded subdivision map, certifying that "all provisions of the Subdivision Map Act . . . have been complied with." The Subdivision Map Act is codified at title 7, division 2 of the Government Code, section 66410 et seq. (§ 1352, subd. (c).)

The only necessary document remaining is a "declaration." (§ 1352, subd. (a).) The Davis-Stirling Act defines "declaration" as "the document, however denominated, which contains the information required by Section 1353." (§ 1351, subd. (h).) Section 1353, subdivision (a)(1), provides, "A declaration, recorded on or after January 1, 1986, shall contain a legal description of the common interest development, and a statement that the common interest development is a community apartment project, condominium project, planned development, stock cooperative, or combination

thereof. The declaration shall additionally set forth the name of the association and the restrictions on the use or enjoyment of any portion of the common interest development that are intended to be enforceable equitable servitudes."[3] Section 1353, subdivision (b), provides, "The declaration may contain any other matters the original signator of the declaration or the owners consider appropriate."

 While section 1353 sets strict standards for declarations recorded in or after 1986, it imposes no such requirements for declarations recorded before 1986. At most, it implies the declaration must be recorded and may contain any matter deemed "appropriate." (§ 1353, subd. (b).) This is no accident. The Davis-Stirling Act "governs common interest developments that predate its enactment." (*Nahrstedt, supra,* 8 Cal.4th at p. 378, fn. 8.) As originally enacted in 1985, section 1353 imposed the same requirements on all common interest development declarations, even those that had already been recorded. (Former § 1353; Stats. 1985, ch. 874, § 14, pp. 2774, 2777.) The Legislature amended section 1353 in 1986 to add the limiting phrase, "recorded on or after January 1, 1986," to the declaration requirements. (Stats. 1986, ch. 9, § 2, p. 26.) The Legislature thus intended the Davis-Stirling Act to govern preexisting common interest developments without foisting section 1353's new declaration requirements upon them. Accordingly, the amended version of section 1353 demands little of a declaration for a pre-1986 common interest development.

The declaration of trust meets section 1353's minimal requirements for a pre-1986 declaration. Namely, it was recorded in 1962 and binds GRF and each Mutual. (§ 1353, subd. (a).) It contains other matter that Leisure World's creators deemed appropriate—GRF's duty to construct, manage, and maintain the common facilities; GRF's title as trustee to the common facilities; and GRF's duty to perform services for the Mutuals pursuant to contemplated agreements. The Legislature requires nothing more.

GRF and its amici curiae offer a multitude of arguments why the declaration of trust cannot be a declaration pursuant to section 1353. None are convincing.

 GRF primarily contends the declaration of trust does not satisfy section 1353 because it lacks any covenants, conditions, and restrictions (CC&R's). But section 1353 does not require a pre-1986 declaration to contain CC&R's or much of anything else, as already shown.

GRF misplaces its heavy reliance on *Nahrstedt, supra,* 8 Cal.4th 361, taking that case's language out of context. Before *Nahrstedt* addressed the

---

[3] Section 1353, subdivision (a)(1)–(4), contains other requirements for declarations regarding property located within an "airport influence area" or the jurisdiction of the San Francisco Bay Conservation and Development Commission. No party contends these requirements apply here.

issue before it—whether CC&R's barring pet ownership are enforceable—it provided "a broad overview of the general principles governing common interest forms of real property ownership" (*id.* at p. 370), tracing "[t]he concept of shared real property ownership" back to "its roots in ancient Rome" (*id.* at p. 371). *Nahrstedt* was still in the throes of its historical reverie when it stated that a declaration "is a collection of covenants, conditions and servitudes" and "[t]ypically . . . sets forth restrictions pertaining to the use of the property." (*Id.* at p. 372.) It was not analyzing section 1353 when it made these observations—it was paraphrasing a law review article, a treatise, and a legal encyclopedia. (*Nahrstedt*, at p. 372.) *Nahrstedt* did not begin examining the "extent [to which] these general principles [are] reflected in California's statutory scheme" for almost another six pages of its opinion. (*Id.* at p. 377.) And *Nahrstedt* never did analyze section 1353, except to note, "[d]eclarations *recorded after January 1, 1986, the effective date of the Act, must include* . . . 'the restrictions on the use or enjoyment of any portion of the common interest development.' " (*Id.* at p. 378, italics added.) Nothing in *Nahrstedt* suggests the Davis-Stirling Act requires pre-1986 declarations to contain CC&R's.

GRF also relies upon section 1353's predecessor statute, though the statutory evolution actually works against it. Before the Davis-Stirling Act was enacted to govern all types of common interest developments, the statute governing condominium projects required developers to "record a declaration of restrictions relating to such project, which restrictions shall be enforceable equitable servitudes . . . ." (Civ. Code, former § 1355; Stats. 1963, ch. 860, § 3, pp. 2091, 2092.) But this section applies only to condominiums like Mutual No. Seventeen—it does not govern GRF or the other Mutuals. And there is no dispute that Mutual No. Seventeen has CC&R's. Moreover, when the Legislature enacted the Davis-Stirling Act and replaced former section 1355 with current section 1353, it replaced the phrase, "a declaration of restrictions," with the much broader term, "a declaration." Contrary to GRF's suggestion, this change *reinforces* the conclusion that pre-1986 declarations for common interest developments other than condominiums need not contain CC&R's.

 GRF also relies upon a host of practice guides, treatises, and regulations suggesting that declarations typically contain CC&R's. That may be so. But the plain language of section 1353 does not require pre-1986 declarations to contain CC&R's. "In the construction of a statute or instrument, the office of the Judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted . . . ." (Code Civ. Proc., § 1858.) " 'When deciding what a statute means, courts seek to determine what effect the legislative body that enacted it intended to achieve. [Citation.] To make this determination, courts begin with the text of the statute, because the words used are the best evidence of legislative intent. [Citations.] Unless there is reason to believe that a special or technical

meaning was intended, courts give the words of the statute their usual, ordinary meaning.' " (*Sacramento County Alliance of Law Enforcement v. County of Sacramento* (2007) 151 Cal.App.4th 1012, 1017 [60 Cal.Rptr.3d 202].) We will not rely upon common contemporary technical practice to rewrite section 1353 or trump the ordinary meaning of its plain language. The statute simply does not require pre-1986 declarations to contain CC&R's or much else—we will not "insert what has been omitted." (Code Civ. Proc., § 1858.) At any rate, to whatever extent use restrictions are typical of common interest developments, Leisure World appears to have such restrictions through the occupancy agreement each resident must accept.

Next, GRF contends that reading section 1353 as permitting pre-1986 declarations to lack CC&R's will wreak havoc by suddenly transforming property across the state into common interest developments. Not so. A recorded declaration pursuant to section 1353 is just one element of a common interest development. The defining feature of a common interest development is the conveyance of "a separate interest coupled with an interest in the common area or membership in the association . . . ." (§ 1352.) Construing section 1353 according to its plain language will not transform *any* property into a common interest development unless a declaration is recorded *and* the owners hold separate interests coupled with a common interest or association membership.

 In addition, GRF contends the declaration of trust was recorded to satisfy the concerns of the Federal Housing Administration (FHA) and other lenders, not with the intention of creating a common interest development. But the Davis-Stirling Act conditions common interest development status on the recording of a declaration, not the subjective intention behind the recordation. And because the FHA loans were repaid decades ago, as GRF concedes, no concern about any sort of federal preemption arises.

GRF and its amici curiae contend the declaration of trust conflicts with various Davis-Stirling Act provisions regarding common interest development declarations. They assert the declaration does not authorize GRF to levy assessments or record liens directly against residents or their separate interests, although associations have those rights pursuant to the Davis-Stirling Act. (§§ 1366, 1367.) The Davis-Stirling Act also imposes requirements on associations bringing construction defect suits, but the amici curiae note the declaration of trust imposes no such duties on GRF. (§ 1375.) The amici curiae also claim the Davis-Stirling Act allows common interest development members to amend their declaration, whereas Leisure World residents are not parties to the declaration of trust and have no amendment rights under it. (§ 1355.)

There is no conflict. The declaration does not prohibit GRF from making direct assessments, direct levies, or complying with section 1375's procedural

requirement. GRF cannot avoid association status simply by noting the declaration did not expressly anticipate each of the rights and obligations it would eventually have under the Davis-Stirling Act. And section 1355, subdivision (a), provides that a development's declaration "may be amended pursuant to the governing documents or this title." Thus, the declaration of trust will continue to be subject to amendment pursuant to its terms or the statute.

Contrary to GRF's and the Mutuals' concern, the court did not unfairly adjudicate the Mutuals' rights in their absences by determining Leisure World is a common interest development. The judgment addresses only GRF, without mentioning the Mutuals. It provides, "Petitioner [GRF] is an 'association' within the meaning of and subject to the provisions of the Davis-Stirling Act." The court's observation in its statement of decision that "GRF and the Mutuals have, in effect, a master association/subassociation relationship," was an *analogy*, not a finding of fact. And "even if one assumes that [the court's] observation in the statement of decision was a finding, it was entirely unnecessary to the judgment rendered and should not be given collateral estoppel effect." (*Bronco Wine Co. v. Frank A. Logoluso Farms* (1989) 214 Cal.App.3d 699, 712 [262 Cal.Rptr. 899].) We express no opinion on whether GRF and the Mutuals do, in fact, have a master/subassociation relationship, leaving that determination, if necessary, for later resolution in an appropriate forum.

■ Nor is the judgment suspect because the Mutuals now claim to be indispensible parties. "Since the 1971 revision of Code of Civil Procedure section 389, failure to join 'indispensable' parties does not deprive a court of the power to make a legally binding adjudication between the parties properly before it." (*Weir v. Ferreira* (1997) 59 Cal.App.4th 1509, 1519 [70 Cal.Rptr.2d 33].) "[T]he failure to join an 'indispensable' party is not 'a jurisdictional defect' in the fundamental sense; even in the absence of an 'indispensable' party, the court still has the power to render a decision as to the parties before it which will stand." (*Kraus v. Willow Park Public Golf Course* (1977) 73 Cal.App.3d 354, 364 [140 Cal.Rptr. 744].) And where, as here, " 'a case has been fully tried without objection to the absence of parties and the claim that the absent parties were indispensable is raised for the first time on appeal, the rule's underlying policy considerations of avoiding piecemeal litigation and multiplicity of suits [citations] are of little consequence inasmuch as the judicial and litigant resources necessary to the litigation have already been expended.' " (*Id.* at p. 369.)

## DISPOSITION

The judgment is affirmed. Defendants shall recover their costs on appeal.

Rylaarsdam, Acting P. J., and Aronson, J., concurred.

A petition for a rehearing was denied July 8, 2008, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied August 27, 2008, S165275.