Filed 1/21/25  Lipton v. Fairbanks Ranch Association CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| STUART A. LIPTON et al., | D082967 |
| Plaintiffs and Respondents, | |
| v. | (Super. Ct. No. 37-2019-00063250-CU-CO-NC) |
| FAIRBANKS RANCH ASSOCIATION, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of San Diego County, Earl H. Maas III, Judge.  Affirmed.

Berding & Weil LLP, Anne L. Rauch, and Trinette S. Sachrison for Defendant and Appellant.

Niddrie Addams Fuller Singh LLP, John S. Addams; Law Offices of Golub & Associates, Mitchell S. Golub; Scott D. Levine, and Scott D. Levine for Plaintiffs and Respondents.

Fairbanks Ranch is a residential development governed by the Davis-Stirling Common Interest Development Act (Civ. Code, § 4000 et seq.[1], hereafter Davis-Stirling Act or Act).  In 2017, homeowners in the development, Seymore and Jo Lotsoff, discovered the retaining wall surrounding their tennis court was failing and needed to be repaired.  This repair, in turn, required the Lotsoffs to remove a bamboo hedge that had previously prevented their neighbors, Stuart and Elisabeth Lipton, from seeing the tennis court and its lights.  The Lotsoffs, acting with the acquiescence of the development's governing homeowners association, the Fairbanks Ranch Association (Association), did not replace the bamboo hedge.

The Liptons complained to the Association that the unscreened tennis court violated the development's use restrictions and, after the Association failed to require the Lotsoffs to replace the hedge, filed the underlying lawsuit.  After a bench trial, the court entered judgment finding the Association's failure to require the Lotsoffs to replace the natural screen created by the bamboo violated the development's governing documents.  The Association appeals, arguing its decisions regarding the bamboo hedge were entitled to deference from the trial court and reversal on this basis is warranted.  For the reasons set forth below, we disagree and affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Pre-Litigation Conflict*

In 1999, the Liptons purchased a home in Fairbanks Ranch, a planned residential community of 618 homes.  In 2006, the Lotsoffs purchased a

---

[1]     Subsequent undesignated statutory references are to the Civil Code.

neighboring home. The Association is a non-profit, mutual benefit corporation responsible for enforcing the development's recorded declaration of covenants, conditions, and restrictions (CC&Rs) and other governing documents. Both the Lotsoffs and Liptons have tennis courts on their properties. The Lotsoffs' tennis court is lighted and, at the time they purchased the home, the court and its lights were shielded by a large bamboo hedge. The hedge, which towered over 20 feet high, entirely prevented the Liptons from seeing the Lotsoffs' tennis court and its lights.

In March 2017, the Lotsoffs discovered that the retaining wall for the tennis court was failing. Jo was playing with her dogs on the court and noticed one of the security lights on the top of the chain link fence surrounding the court was leaning out.[2] This prompted her to contact Don Frank, the Association's construction manager. Frank advised Jo that the retaining wall on which the chain link fence was built had failed. Frank recommended the civil engineering firm of Ken Descanzia to repair the wall. Descanzia was the original civil engineer for Fairbanks Ranch and worked on projects in the community regularly.

A few days after discovering the failing retaining wall, the Lotsoffs contracted with Descanzia's firm to perform the repair work. The work took place in July 2017. The retaining wall repair required the bamboo hedge, which is located directly in front of the retaining wall, to be trimmed down to its roots. Removal of the bamboo was necessary to allow heavy equipment to access the wall for the installation of anchors, which Descanzia described as "soil nails," that reattached the wall to the slab underneath the tennis court.

---

[2]    First names are used periodically in this opinion to avoid confusion. No disrespect is intended.

Before beginning the work, Descanzia contacted the County of San Diego and was told by the County's building department that no permit was required to repair the existing structure. Descanzia also testified that he discussed the project with Frank and they determined there was no need to submit the plans to the Association's Environmental Control Committee (ECC), the volunteer committee responsible for oversight of exterior modifications to properties in the development and enforcement of the Association's architectural guidelines.

At some point after the repair, Elisabeth Lipton called Seymore Lotsoff and complained about the unscreened tennis court. According to Jo, Seymore told Elisabeth that the removal of the bamboo was necessary to reinforce the failed retaining wall and the bamboo was growing back. According to Elisabeth, Seymore told her that he and his wife liked the view of a pond between the two properties that removal of the bamboo revealed. Elisabeth testified that during this conversation she invited the Lotsoffs over to see the problem, and Seymore responded that he would consider the invitation. She also testified that he asked her to call him if the tennis court's lights were on and they would turn them off.

In March 2018, approximately eight months after the bamboo's removal, the Liptons complained to the ECC that the Lotsoffs' tennis court was not sufficiently screened in accordance with the Association's rules and that the court's lights were disrupting their sleep. In May 2018, members of the ECC visited the Liptons' property to view the Lotsoffs' tennis court. At a meeting that month, the ECC reported that it had asked the Lotsoffs to install a green tennis court screen on the chain link fence on the side facing the Liptons' property and to replace the bamboo, which the committee stated

4

was an invasive species, with a ficus nitida hedge to further screen the court from the Liptons' view.

Meeting minutes from the ECC's June 12, 2018 meeting indicate that the Lotsoffs informed the committee they were letting the bamboo hedge grow back to screen the tennis court, and that the ECC was directing them to install a 30-minute timer on the tennis court's lights. On June 21, 2018, the ECC sent a letter to the Lotsoffs stating that after the June ECC meeting, they received a report that the Lotsoffs' tennis court's lights had been left on all night and directing them to install a timer on the lights. On July 6, 2018, Seymore Lotsoff sent an email to Frank confirming their lighting system had been programmed to shut off the tennis court's lights after 30 minutes.

The next month's ECC meeting minutes, dated July 10, 2018, reported that the committee had met with the Lotsoffs to "review the status of plant screening" of the tennis court. The minutes stated that "[t]he installation of additional tennis court screening was discussed, including the installation of plastic screening on the chain-link fence," but that "[n]o conclusion was reached during the meeting." The minutes also reported that, after the meeting with the Lotsoffs, the ECC "reviewed the [Association's] Architectural Guidelines which state in part under ANCILLARY FACILITIES that tennis courts be naturally screened from adjacent home sites with plant materials that soften the visual impact" and that the "Committee [would] request that the Lotsoffs supplement the existing new growth bamboo screen with taller more mature bamboo that will effectuate more immediate screening than is currently provided by the new growth bamboo."

During the summer of 2018, the Lotsoffs planted additional bamboo, but with a variety that did not grow as tall as the original bamboo. After

5

receiving additional complaints from the Liptons, the ECC emailed Stuart Lipton forms to initiate formal dispute resolution. Stuart responded that he should not be required to take additional action, and that the ECC should enforce its prior written decision to require the Lotsoffs to replace the 20-foot hedge and install screening.

Thereafter, the Liptons initiated a formal Internal Dispute Resolution (IDR) proceeding with the Association. An IDR meeting took place on November 12, 2018 with the Liptons; a member of the Association's Board, Dr. Stephen Charlton; a member of the ECC, Richard Sparber; and the Association's general manager, Raymond Sohl. A letter documenting the proceeding was prepared on November 14, 2018. Therein, the Association proposed as a resolution to the dispute that the ECC direct the Lotsoffs to "install plastic screening on the entire length and full height of the chain link fence which bounds the tennis court on the side facing" the Liptons' property and "to complete the installation within 30 days." In addition, the letter proposed that the ECC would direct the Lotsoffs to irrigate and fertilize the existing bamboo to maximize its growth. The proposal also stated, "the ECC will direct the [Lotsoffs] to monitor the tennis court lighting so as to eliminate its usage after dusk until the bamboo screening has reached sufficient height to diffuse the glare of the lights."

The Liptons responded with a request that the Association add a sanction provision for noncompliance by the Lotsoffs. The Association did not respond to the Liptons' request. Dr. Charlton testified at trial that he did not think the Association had the ability to force the Lotsoffs to comply with the directive in the manner the Liptons wanted.

The written record is silent until August 2019, when the Lotsoffs' tennis court screening issue appeared on the Association's Rules Enforcement

6

Committee (REC) meeting minutes for its August 6, 2019 meeting. The minutes state that "Mr. & Mrs. Lotsoff attended the meeting to further discuss the screening of the tennis courts and for an unapproved bridge on their property. A recent site inspection noted the improved growth of the bamboo. After careful consideration, the Committee agrees that the bamboo will provide adequate screening and will continue to grow, to provide a full screening of the tennis courts. No further action is required."

On August 8, 2019, Michael Conger, a member of the Association's Board of Directors, met with the Liptons, their counsel, and the Association's counsel to address the Liptons' continued complaints about the Lotsoffs' tennis court. Conger memorialized the meeting in an email to the other board members. Therein, Conger explained the Liptons were asserting the Lotsoffs violated the Association's rules by installing more lighting on the tennis court, removing a screen from the tennis court fence, and removing the bamboo. The Liptons also asserted these rules violations were "obnoxious and offensive activity" that violated the Association's CC&Rs. Conger reported that during the meeting Stuart Lipton called the prior owner of the Lotsoffs' property, who had installed the tennis court originally, and he confirmed there had been no screen on the tennis court fence, only the natural screen of the bamboo hedge.

In his email, Conger suggested the board consult with Jim Taylor, a landscaping consultant for the Association, to determine if anything else could be done to further facilitate the growth of the bamboo. Conger also recommended that the Association determine if the Lotsoffs had changed or added lighting on the tennis court. He noted there appeared to be "lower, **very bright lights, shining directly at the Liptons**—which would not be

7

consistent with the 1983 Architectural Guidelines" for the Association—that might need to be removed.

On August 22, 2019, Taylor sent an email to Conger stating he had inspected the tennis court on the Lotsoffs' property and found that the bamboo that was planted after the repair work was different from the "Giant Timber Bamboo" that was cut back. Taylor wrote that the new bamboo was "Golden Goddess Bamboo" that would not grow as high as the Giant Timber and would not screen the tennis court as effectively.[3] Taylor recommended removing approximately eight to ten Golden Goddess plants and replacing them with eight to ten Giant Timber plants.

The meeting minutes for the Association's board meeting on October 3, 2019, state that Conger had reviewed the prior ECC decisions and communications between the Association and the Liptons, and had "reviewed the property," and suggested that the Association "write to the [Lotsoffs] asking that they replant their current bamboo with the correct species that grows much faster than what they currently planted." The minutes from the board's October 22, 2019 meeting state, "Mike Conger will write a letter to the Lotsoffs to replant their current bamboo with the correct species that grows much faster than what they currently planted."

Thereafter, however, the board determined that the letter was not necessary. One board member, Dr. Charlton, was concerned that directing the Lotsoffs to remove the bamboo that had been planted would be counter-productive since the bamboo had grown significantly in the year since it was

---

[3]    At trial, Jo Lotsoff testified that they did not plant Golden Goddess but another variety, Golden Hawaii, which she stated grows up to 30 feet tall.

planted.[4]  The board concluded that the bamboo that was there would soon be sufficient to screen the tennis court.

B. *Litigation & Trial*

In November 2019, the Liptons filed suit against the Association and the Lotsoffs for breach of the Association's governing documents, failure to enforce the governing documents, nuisance, and declaratory relief.  The Liptons' complaint also sought injunctive relief and damages.  The Association and the Lotsoffs responded with general denials of all of the allegations in the complaint.

After discovery, in August 2021, the Association moved for summary adjudication of the Liptons' first cause of action for "Failure to Comply with Governing Documents and Failure to Enforce Governing Documents (Civil Code, § 5975)."  The Association asserted the evidence showed it had followed its governing documents and, under those documents, it was entitled to deference from the court for its discretionary decisions.

Before filing its summary judgment motion, the Association received several complaints concerning the Liptons' property—including three from the Lotsoffs.  As a result, in June 2021, the Association notified the Liptons to remove dead trees from their property, cover bare parts of their landscaping, and screen their own tennis court with plants.  The Liptons refused to remedy these issues and the Association imposed fines on the Liptons for noncompliance in September 2021.  As a result, on November 8, 2021, the Liptons brought a motion to amend their complaint to assert a claim for retaliation against the Association.  In addition, the Liptons sought an

---

[4]   In September 2019, however, the Lotsoffs did plant additional Giant Timber bamboo to supplement the growth of what was already there.

9

injunction preventing the Association from collecting fines until the conclusion of the litigation.

In December 2021, the trial court granted the Liptons' motion to amend and issued the requested preliminary injunction. The court also denied the Association's motion for summary adjudication, finding it was moot in light of the amended complaint and, alternatively, triable issues of fact remained concerning the Association's enforcement of its governing documents.

Before trial, the Liptons dismissed their nuisance cause of action. The bench trial on the Liptons' remaining claims began in March 2023.[5] In their trial brief, the Liptons asserted the Association had violated its governing documents by allowing the Lotsoffs to remove the bamboo without applying to the ECC for approval and by allowing the tennis court lights to adversely impact them. The Liptons sought an injunction requiring the Lotsoffs to remove the "spotlights" from their backyard or tennis court; "[l]eave the lights on the tennis court off until the court is shielded or remove all of the lights;" "screen the tennis court with natural planting materials;" "[n]ot be permitted to cut the natural planting materials in the future;" and "to paint the wall on their tennis court light grey." Finally, the Liptons sought an order making the prior preliminary injunction permanent.

The trial took place over six days. The Liptons and Lotsoffs testified, as well as several members of the Association's board and ECC. Stuart Lipton testified that the Lotsoffs' tennis court lights were turned on regularly at night and often for hours at a time. The court received into evidence photographs Stuart took of the tennis court during the day and night. Stuart

---

5 Additional litigation, including an unsuccessful demurrer by the Association to the Liptons' claim for declaratory relief, also took place before trial.

10

also testified that after the bamboo removal he was diagnosed with a serious form of cancer and started chemotherapy, which increased his sensitivity to light. He stated he was often awakened by the tennis court gleaming in the bright sun, or by its lights at night, and that during his treatment he was tortured by the tennis court. He told the court he purchased a home in Palm Springs in 2020 and left his home for a period of time to avoid the sight of the tennis court.

Volunteer members of the board and ECC testified that they did not think the retaining wall repair and removal of the bamboo required the Association's approval because they were necessary maintenance. In addition, both the Association and the Liptons presented expert testimony concerning standard practices for homeowners associations. The Liptons' expert, a lawyer specializing in homeowners association (HOA) law, opined the retaining wall repair and removal of the bamboo was not ordinary maintenance that would typically be exempted from HOA approval.

The Association's expert, also a lawyer specializing in HOA law, opined that the Association's CC&Rs did not require approval for "like-for-like" repair. He further opined that removing the bamboo was not a violation of the Association's governing documents. The expert explained that failure to replace the bamboo would be a violation, but that was not what occurred here. Rather, the Lotsoffs' regrowth and supplementation of the bamboo kept them in compliance with the Association's governing rules.

The Liptons and the Association also presented testimony from landscape experts. The Liptons' expert testified that with proper care, the bamboo cut down by the Lotsoffs would take about three years to grow tall enough to screen the tennis court's lights. He testified that as of January 2023, the bamboo at issue had not returned to its original height.

11

He opined the bamboo's growth was likely hindered by inadequate watering and fertilization and the plant did not start flourishing until 2020. The expert also testified that the Lotsoffs could have planted bamboo at the time of the repair work that was already 20 feet high or taller.

The Association's landscape expert opined the Giant Timber bamboo at issue typically grows between six and eight feet per year, until it tops out around 50 feet. He also testified that the photographs taken over time showed the bamboo was growing normally and, by the time of his engagement in the matter in 2021, the bamboo was approaching 30 feet high. Finally, he stated it would be challenging to find 20-foot-high bamboo to purchase.

C. *The Trial Court's Statement of Decision & Judgment*

After trial, the court issued its initial statement of decision. The Liptons filed a request for clarification and modification of the decision, and the Association filed various objections. The court made minimal changes to the decision and issued its final statement of decision on May 30, 2023. In its decision, the court stated it found all parties to be credible, but their "differing perceptions of facts and their neighbor's actions [made] resolution difficult." The court also stated it found the Liptons' experts to be credible and the Lotsoffs' experts to be not credible.

Before stating its decision, the court noted that "[b]oiled to its essence," the case was simple. "The reduction/removal of the bamboo created a visual situation which was not resolved and continued to exist, and cause annoyance for many years." The court noted that although the bamboo had regrown, "the ill will remain[ed]" and "the litigation has been 'spirited' resulting in all parties incurring significant attorney's fees which they seek to recover here."

12

The court then concluded the board was "entitled to judicial deference where it acts in a manner consistent with its governing authority and exercises its discretion within that authority. However, where a board acts in a manner inconsistent with those governing documents, i.e., where the governing documents do not extend such discretion, the actions are not entitled to judicial deference." The court then found the retaining wall repair did not require the Association's approval under its governing documents. The court found the total removal of the bamboo did require the Association's approval and, further, the failure to adequately screen the tennis court's lights "factually infringe[d] on the [Liptons'] property" in violation of the CC&Rs. The court rejected the Liptons' request that the Lotsoffs be enjoined from using their tennis courts lights in the future, finding the Liptons had not shown the lights were currently insufficiently screened by the bamboo.

With respect to the Liptons' claim for retaliation by the Association, the court concluded that the Association's actions against the Liptons were mostly proper and did not permanently enjoin the Association's enforcement actions, with one exception. The court found that the Association's decision to require the Liptons to landscape or cover an easement road around the pond was improper retaliation for the lawsuit and permanently enjoined the Association from enforcing the alleged violation.

Thereafter, the Liptons submitted a proposed judgment, which the Association and the Lotsoffs opposed. The court rejected the proposed

13

judgment, instead entering the statement of decision as the judgment of the court. The Association timely appealed.[6]

DISCUSSION

On appeal, the Association asserts the trial court erred by finding it had violated its governing rules by failing to require the Lotsoffs to screen their tennis court while the bamboo grew back. The Association argues the removal of the bamboo was indivisible from the retaining wall repair, and thus the trial court could not separately find the removal was a violation of the Association's governing documents. The Liptons respond that the

---

[6]    The Association asks this court to take judicial notice of the Liptons' motion for attorneys fees and costs, and memorandum of costs; the Association's motion to determine the prevailing party and for an award of attorneys fees, and memorandum of costs; the Lotsoffs' motion for attorneys fees and memorandum of costs; and the trial court's order staying the attorneys fees and costs proceedings until this appeal is concluded. The request is denied. These documents were filed after the entry of the judgment appealed by the Association, and therefore are not properly before this court. (See *Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3 ["Reviewing courts generally do not take judicial notice of evidence not presented to the trial court. Rather, normally 'when reviewing the correctness of a trial court's judgment, an appellate court will consider only matters which were part of the record at the time the judgment was entered.' "].) Further, the Association has not shown the documents are relevant to the disposition of its appeal. (*Ross v. Seyfarth Shaw LLP* (2023) 96 Cal.App.5th 722, 745 ["It is not sufficient that the evidence be relevant to an argument made by its proponent. The evidence must be relevant to the disposition of the matter."].)

As the trial court pointed out in its statement of decision, the amount of money expended in this case to litigate the growth of a bamboo hedge and tennis courts lights is extraordinary. We are not blind to this fact and hope the passage of time has begun to mend the remarkable animosity between these neighbors, and that the issue of attorneys fees can be determined without further significant expense. Mediation of this remaining dispute seems particularly appropriate in this case.

Association's failure to require screening of the tennis court was not entitled to judicial deference because it was inconsistent with its governing documents and the trial court's finding that this failure was a violation of the documents was correct.

## I

### *Legal Standards*

Condominiums, cooperatives, and planned developments with homeowners associations "are known as 'common interest' developments." (*Nahrstedt v. Lakeside Village Condominium Assn.* (1994) 8 Cal.4th 361, 370 (*Nahrstedt*).) To create a common interest development, the developer prepares "a declaration that must be recorded prior to the sale of any unit in the county where the land is located. [Citation.] The declaration, which is the operative document for the creation of any common interest development, is a collection of covenants, conditions and servitudes that govern the project." (*Id.* at p. 372.) "[T]he declaration describes the real property and any structures on the property, delineates the common areas within the project as well as the individually held lots or units, and sets forth restrictions pertaining to the use of the property." (*Ibid.*)

"The restrictions on the use of property in any common interest development may limit activities conducted in the common areas as well as in the confines of the home itself." (*Nahrstedt, supra*, 8 Cal.4th at p. 373.) "Restrictions on property use are not the only characteristic of common interest ownership. Ordinarily, such ownership also entails mandatory membership in an owners association, which, through an elected board of directors, is empowered to enforce any use restrictions contained in the project's declaration ... and to enact new rules governing the use and occupancy of property within the project." (*Ibid.*)

"In California, common interest developments are subject to the provisions of the Davis-Stirling [Act.]  The Act, passed into law in 1985, consolidated in one part of the Civil Code certain definitions and other substantive provisions pertaining to condominiums and other types of common interest developments.  (Stats. 1985, ch. 874, § 14, p. 2774.)  The Act ... sets out the requirements for establishing a common interest development ..., reserves to each homeowner in such a development limited authority to modify an individual unit ..., grants to the owners association of the development those powers necessary to the development's long-term operation ..., and recognizes the right of homeowners collectively to alter or amend existing use restrictions, or to add new ones ...."  (*Nahrstedt, supra*, 8 Cal.4th at pp. 377–378.)

Under section 5975, courts must "enforce the covenants, conditions and restrictions contained in the recorded declaration of a common interest development 'unless unreasonable.' "  (*Nahrstedt, supra*, 8 Cal.4th at p. 368.)  The statute creates a presumption that a use restriction contained in a recorded declaration is reasonable; a party challenging a restriction carries the burden to prove otherwise.  (*Id.* at p. 380.)  Use "restrictions should be enforced unless they are wholly arbitrary, violate a fundamental public policy, or impose a burden on the use of affected land that far outweighs any benefit."  (*Id.* at p. 382.)  "[W]hen an association determines that a unit owner has violated a use restriction, the association must do so in good faith, not in an arbitrary or capricious manner, and its enforcement procedures must be fair and applied uniformly."  (*Id.* at p. 383.)

In addition, "[w]here a duly constituted community association board, upon reasonable investigation, in good faith and with regard for the best interests of the community association and its members, exercises discretion

16

within the scope of its authority under relevant statutes, covenants and restrictions to select among means for discharging an obligation ..., courts should defer to the board's authority and presumed expertise." (*Lamden v. La Jolla Shores Clubdominium Homeowners Assn.* (1999) 21 Cal.4th 249, 265 (*Lamden*).) This deference allows associations "to make the detailed and peculiar economic decisions necessary in the maintenance of [such] developments" while "minimizing the likelihood of unproductive litigation over their governing associations' discretionary economic decisions, [and] foster[ing] stability, certainty and predictability in the governance and management of common interest developments." (*Id.* at pp. 270–271.)

However, this deference is not extended "to board decisions that are outside the scope of its authority under its governing documents. *Lamden* specifically reaffirmed the principle that, ' "Under well-accepted principles of condominium law, a homeowner can sue the association for damages and an injunction to compel the association to enforce the provisions of the declaration." ' " (*Ekstrom v. Marquesa at Monarch Beach Homeowners Assn.* (2008) 168 Cal.App.4th 1111, 1122 (*Ekstrom*).) Further, courts will generally "uphold decisions made by the governing board of an owners association," but only if "they represent good faith efforts to further the purposes of the common interest development, are consistent with the development's governing documents, and comply with public policy." (*Nahrstedt, supra*, 8 Cal.4th at p. 374.)

"An appealed judgment or order is presumed to be correct, and the appellant bears the burden of overcoming that presumption. [Citation.] ... [T]he trial court's decision to grant or deny [declaratory] relief will not be disturbed on appeal unless it is clearly shown its discretion was abused." (*Ekstrom, supra*, 168 Cal.App.4th at p. 1121.) This court independently

17

interprets the governing documents of a homeowners association where they do not turn on the credibility of extrinsic evidence. (*Eisen v. Tavangarian* (2019) 36 Cal.App.5th 626, 635.) The trial court's factual findings, however, are reviewed for substantial evidence. We may not substitute our assessment of the facts for the trial court's when there is substantial evidence to support the trial court's factual findings. (*People v. Sifuentes* (2022) 83 Cal.App.5th 217, 235.) " 'Substantial' evidence is evidence of ponderable legal significance, evidence that is reasonable, credible and of solid value." (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 651.)

II

*Fairbanks Ranch Governing Documents*

Under the Association's CC&Rs, which were entered into evidence during trial, the Association has "the power to do any and all lawful things which may be authorized, required or permitted to be done by the Association by [the] Declaration, the Articles and the By-laws, and to do and perform any and all acts which may be necessary or proper for or incidental to the exercise of any of [its] express powers." The Association's powers include performing acts, "whether or not expressly authorized by this Declaration, as may be reasonably necessary to enforce any of the provisions of this Declaration and the Association Rules."

In addition, the CC&Rs authorize the Association's five-member board of directors to create rules and regulations, which "have the same force and effect as if they were set forth in and were a part of [the] Declaration." The Association's Rules and Regulations, also entered into evidence, contain a written policy for resolution of homeowner complaints of non-compliance with its governing documents and a fine schedule. Thereunder, the Board, ECC, or any owner or resident can "request in any reasonable manner that a

18

Member, resident, tenant, or invitee thereof cease or correct any act or omission which appears to be in violation of the Governing Documents of the Association." The policy encourages informal resolution of such complaints, but if informal attempts are unsuccessful, disciplinary proceedings can be initiated by the submission of a written complaint to the board.

"Upon the filing of the Complaint, to the extent the Board deems appropriate, the Board shall reasonably investigate the Complaint to verify that, if true, the allegations constitute violation(s) of the Governing Documents. If so (and if the Board, in its sole discretion determines that enforcement is appropriate in the case in question), the Board shall send a written First Notice (warning letter) to the Respondent, summarizing the Complaint and requesting compliance with the Governing Documents." No penalty or fine can be assessed at the time of this initial notice. If the violation persists, a second notice is sent and must provide the non-compliant homeowner with an opportunity for hearing before the board or the Association's REC. The board or REC then must issue a decision within 15 days of that hearing. An REC decision can be appealed by the homeowner to the board.

The CC&Rs also incorporate the Association's architectural guidelines. The guidelines, also entered into evidence at trial, set forth specific standards for the construction of tennis courts in the development. The trial court quoted from this provision in support of its determination that the Lotsoffs' failure to screen their tennis court violated the development's governing documents. The provision states: "Tennis courts must be located so that they will not infringe upon view corridors. *Courts should be naturally screened from adjacent homesite*s and wind screens should be kept to moderate heights. [¶] A plot plan showing the tennis court location shall be provided

19

for the [ECC] showing any and all proposed grading, and screening.  [¶] If constructed, tennis courts should be built in a manner and location that does not require extensive grading and tree removal or construction of raised decks with large retaining walls.  Design and color of fencing materials should blend naturally into the surrounding area and plant materials should be added where necessary to soften the visual impact.  Surface colors should be restricted to colors such as soft reds and greens and not be highly reflective.  *Tennis courts should not impede views and should be screened with natural plant materials.  Night lighting of tennis courts will be prohibited in most instances.*  Tennis courts should be permitted only when they can be constructed so they do not constitute an intrusion upon the adjoining residents."  (Italics added.)

III

*Analysis*

The Association asserts the trial court erred by failing to defer to its decisions concerning the Liptons' complaints about the Lotsoffs' tennis court. Specifically, the Association argues the removal of the bamboo was indivisible from the necessary repair of the tennis court's retaining wall, which the trial court correctly "recognized was a matter subject to judicial deference." Therefore, the Association asserts, its failure to require additional screening was also entitled to deference. To support its argument, the Association first points to Article IV, section 37(c) of its CC&Rs. That provision states that the use restrictions in the CC&Rs do not apply to "[a]ny act done or proposed to be done upon the Property, or any condition created thereon which act or condition has been approved in advance by the Board or the [ECC] acting within its authority as set forth in Article V of this Declaration."[7]

The Association contends that because "the ECC was aware of the repair project, reviewed the plans in advance, assisted with access, and inspected the project both before and after to ensure no unapproved modifications were made," the use restrictions contained in the CC&Rs do not apply to the removal of the bamboo screen. As the Liptons point out, however, this argument was not raised by the Association in the trial court. Accordingly, it is forfeited for purposes of appeal. (See *Howitson v. Evans Hotels, LLC* (2022) 81 Cal.App.5th 475, 489 ["It is well settled that the failure to raise an issue in the trial court typically forfeits on appeal any claim of error based on that issue."].)

---

[7]     Article V creates the ECC and its governing procedures.

21

Further, contrary to the Association's assertion, there is no evidence in the record to show that the ECC (or the Association's board) approved the repair prior to the removal of the bamboo. Rather, the Association's construction manager determined that because the retaining wall work was a necessary repair to maintain the existing tennis court, there was no reason to seek and obtain ECC approval. Indeed, at trial the Association stipulated that the Lotsoffs did not submit any application for approval of the retaining wall work or the removal of the bamboo to the Association and Descanzia testified he discussed his work with Frank and they determined there was no reason to submit a request for approval to the ECC.[8] Because no approval was obtained, by its plain terms, Article IV, section 37(c) does not apply to the Liptons' complaints about the screening of the tennis court.

The Association next argues that even if Article IV, section 37(c) of the CC&Rs does not apply here, the trial court was still required to defer to its handling of the Liptons' complaints concerning the bamboo hedge. As an initial matter, we do not agree with the Association's assertion that the court erred by separating the bamboo screening issue from the repair of the retaining wall. The evidence established, as the trial court found, that the removal of the bamboo screen was necessary for the repair work. However,

---

[8]     The testimony that the Association cites in support of its assertion that the ECC reviewed the plans and concluded the project fell under the repair and maintenance exception, does not support this assertion. Rather, Conger testified that in *hindsight* he did not believe the ECC's approval was needed because the work constituted only a repair and no change would be made to the tennis court's screening. Likewise, Conger's wife, Lori Conger, who was a member of the ECC at the time of the repair work, testified that the ECC did not investigate the screening of the Lotsoffs' tennis court until May 2018, after the Liptons first complained about the lack of screening and approximately 10 months after the repair work.

this fact did not negate the trial court's separate conclusion that the Association had an obligation to act on the Liptons' complaint that the lack of a screen violated the CC&Rs and the tennis court provision of the architectural guidelines. Indeed, the Association provides no legal support for its assertion that the trial court should have deferred to its decisions not to require the Lotsoffs to replace the bamboo or install a screen simply because its removal was necessary for the retaining wall repair.[9]

Article IV of the CC&Rs sets forth the "covenants and restrictions" that "shall govern the use and occupancy" of the properties in the development. Section 12 of Article IV states, "No improvements of any type (other than small plants and flowers) or any structural alteration to any improvements, *or any exterior additions or modifications to any improvements* (including, but not limited to painting), shall be made, constructed or maintained upon any Lot unless and until, (i) the plans and specifications therefor showing the appearance, height, materials and color therefor, (ii) a plot plan showing the location thereof and (iii) appropriate grading plans for the site upon which any structure is to be or is located shall have been approved by the Board or the [ECC] in the manner set forth in Article V hereof."[10] (Italics added.)

Further, section 24 of Article IV, titled "Use of Improvements During Construction; Diligence in Construction," states, "Any Improvement which is partially or totally destroyed, or damaged, by fire, earthquake or otherwise,

---

[9] The Association's own HOA law expert agreed at trial that failure to replace the bamboo would be a violation of the governing documents.

[10] The CC&Rs define "Improvements," as "buildings, garages, carports, streets, roads, driveways, walkways, parking areas, fences, wells, covered patios, porches, elevated porches, sundecks, balconies, hedges, plantings, planted trees and shrubs, lakes, and all other structures or landscaping improvements of every kind, nature or description."

shall be removed, repaired or replaced *within a reasonable time* after such destruction or damage occurs and subject to the requirements of this Declaration, by the then Owner or Owners of that portion of the Lot or Lots upon which the destroyed or damaged Improvement was or is located." (Italics added.) Finally, the Association's architectural guidelines, which the parties agree are incorporated into the CC&Rs, contain the specific provision governing tennis courts set forth above. The guidelines state that tennis courts *"should be naturally screened from adjacent homesites"* and "[*n*]*ight lighting of tennis courts* [*is*] *prohibited in most instances*." (Italics added.)

We agree with the trial court and the Association that the removal of the bamboo hedge to allow for the repair work of the retaining wall was permissible without prior approval by the ECC. However, the governing documents make clear that the Lotsoffs were required to replace the bamboo hedge within a reasonable time after its removal. The trial court's determination that the Association failed to enforce the governing documents by not adequately responding to the Liptons' complaints was supported by the evidence before the court. Put simply, the Association failed to uphold the use restrictions requiring tennis courts to be adequately screened by not requiring the Lotsoffs to replace the bamboo hedge in a timely manner.

The removal of the bamboo, which had provided the required natural screen of the Lotsoffs' tennis court, constituted a structural modification under section 12 of Article IV of the CC&Rs. Though the photos admitted into evidence showed that the bamboo had largely grown back by the time of the trial, the photos also established the hedge was not sufficient to screen the tennis court's lights for years after the repair work was completed. These undisputed facts support a finding that the required natural screen was not "replaced within a reasonable time" as required by section 24 of Article IV.

24

The Association is correct that under its governing documents, it had discretion to determine how to address the complaints made by the Liptons about the Lotsoffs' tennis court. But that discretion did not, as the Association argues, afford it the authority to allow the violations identified by the Liptons to persist for years. The evidence at trial showed the Liptons complained to the Association beginning in March 2018, and the Association entirely failed to address the complaints by the time this lawsuit was filed in November 2019, except to require the Lotsoffs to install a timer on the tennis court's lighting system that turned the lights off after 30 minutes.[11] Instead, the Association determined in the end that because the bamboo was removed as part of a necessary repair, it had no obligation to require the Lotsoffs to comply with the requirements of the Association's governing documents. The trial court correctly concluded that this violated the Association's duties under those documents. (*Nahrstedt, supra*, 8 Cal.4th at p. 374.)

The Davis-Stirling Act creates a presumption that a use restriction— like the Association's requirement that tennis courts and their lights be screened—is reasonable. (*Nahrstedt, supra*, 8 Cal.4th at p. 380.) While courts must generally uphold decisions made by a common interest development's governing board, they must do so only if the decisions "are

---

[11] As discussed, the record shows that at various points the Association proposed to require the Lotsoffs to screen their tennis court, but each time stopped short of requiring any action. Of note, after the IDR meeting, the Association proposed requiring the Lotsoffs install screening around the tennis court on the side facing the Liptons' property, irrigate and fertilize the existing bamboo to maximize its growth and plant additional mature bamboo if needed to "achieve its former height," and require the Lotsoffs to eliminate usage of the tennis court lights "after dusk until the bamboo screening has reached sufficient height to diffuse the glare of the lights." However, when the Liptons proposed adding fines for failing to comply with the proposed requirements, the Association took no further action.

consistent with the development's governing documents." (*Id*. at p. 374.) Here, the decisions of the Association not to require a screen were inconsistent with the use restrictions contained in the CC&Rs and incorporated architectural guidelines. Accordingly, the trial court's finding that the Association acted inconsistently with the governing documents by failing to either "rais[e] temporary visual screening (until the bamboo regrew) or disconnecting the tennis court lights for a similar time period," was appropriate. (See *Ekstrom, supra*, 168 Cal.App.4th at p. 1123 ["The Board's interpretation of the CC&Rs was inconsistent with the plain meaning of the document and thus not entitled to judicial deference."].)

The case the Association cites, *Dolan-King v. Rancho Santa Fe Assn.* (2000) 81 Cal.App.4th 965, in support of its assertion that its decisions were entitled to deference does not lead us to conclude otherwise. In *Dolan-King*, this court held that the trial court erred by "failing to apply the proper deferential standard to test the [development's art jury and board of director's] exercise of discretion." (*Id*. at p. 979.) The art jury and board denied approval of modifications to a home's fence and additions to the home because they determined the proposed design did not comply with the aesthetic, subjective guidelines for the development. (*Id*. at p. 972.) The homeowner sued the board, and the trial court issued a declaration in her favor. On appeal, we held the board had broad authority under its CC&Rs to reject *style* choices and had not exceeded that authority in denying the homeowner's application. (*Id*. at p. 970.) In contrast, here, the Association *failed* to enforce the applicable CC&Rs and architectural guidelines and the trial court properly concluded this failure was "[in]consistent with the development's governing documents." (*Id*. at p. 979.)

26

In *Haley v. Casa Del Rey Homeowners Assn.* (2007) 153 Cal.App.4th 863, also cited by the Association, a condominium-owner sued her HOA for failing to require other owners to remove their personal items from common areas adjacent to their homes. (*Id.* at p. 869.) The trial court rejected the plaintiff's claims, finding the HOA had acted within its discretion under the CC&Rs by amending them to allow some encroachments in the common area. (*Id.* at pp. 873–874.) In affirming the trial court's decision, this court noted the HOA "had discretion to select among means for remedying violations of the CC&Rs without resorting to expensive and time-consuming litigation, and the courts should defer to that discretion." (*Id.* at p. 875.) Unlike *Haley*, the Association here took virtually no action to remedy the violations of its governing documents and enforce the restrictions at issue.

Finally, *Ekstrom*, which the Association relies on, also does not support reversal. *Ekstrom* concerned a development in Dana Point with ocean view homes. The plaintiffs were individual homeowners "whose views ha[d] been blocked by many palm trees in the development ... , which ha[d] grown to heights exceeding the height of rooftops. Because trimming a palm tree would effectively require its removal, the [a]ssociation [took the] position over the years that the CC&Rs' express requirement '[a]ll trees' on a lot be trimmed so as to not exceed the roof of the house on the lot, unless the tree does not obstruct views from other lots, does not apply to palm trees." (*Ekstrom, supra*, 168 Cal.App.4th at pp. 1113–1114.) In accordance with this position, the association "denied Plaintiffs' demands that it enforce the CC&Rs and require offending palm trees be trimmed, topped, or removed." (*Ibid.*)

The plaintiffs then filed suit to compel the HOA to enforce the tree height restriction and the court of appeal affirmed the trial court's judgment

27

imposing that relief. (*Ekstrom, supra*, 168 Cal.App.4th at p. 1114.) In rejecting the HOA's assertion that its decision not to enforce the restriction was entitled to deference from the trial court under *Lamden, supra*, 21 Cal.4th 249, the Court of Appeal held the association's "interpretation of the CC&Rs was inconsistent with the plain meaning of the document and thus not entitled to judicial deference." (*Ekstrom,* at p. 1123.) The same rationale applies here. The Association was free to enforce the restrictions governing screening of tennis courts in the manner it saw fit, but it was not entitled *to fail to enforce* the restrictions. As the trial court found, the Association's decision not to require the Lotsoffs to screen their tennis court in a reasonable amount of time after the removal of the bamboo hedge was inconsistent with the development's governing documents, and thus not entitled to the court's deference.

## DISPOSITION

The judgment is affirmed. Costs are awarded to Respondents.


McCONNELL, P. J.


WE CONCUR:


DO, J.


CASTILLO, J.


28